Alonzo BONNER, Plaintiff-Appellant,

v.

Joseph COUGHLIN et al.,
Defendants-Appellees.

No. 74–1422.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1975.

Decided June 2, 1975.

Fairchild, Chief Judge, filed concurring opinion.

Kenneth N. Flaxman, Chicago, Ill., for plaintiff-appellant.

William J. Scott, Atty. Gen., Jayne A. Carr, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

Appellant contends that his constitutionally protected interest in privacy and property were violated by a "shakedown" search of his prison cell which resulted in the loss of his trial transcript. He asserts a federal right to recover damages on three different theories: (1) that the transcript was taken during the conduct of a search which violated the Fourth Amendment; (2) that the taking of the transcript was a deprivation of property prohibited by the Due Process Clause of the Fourteenth Amendment; and (3) that the defendants [1] interfered with his access to the courts protected by the Sixth and Fourteenth Amendments.[2] Since we conclude that his claims are not entirely without merit, we reverse the summary judgment entered by the district court and remand for trial.

The verified complaint and the affidavits submitted by appellant in opposition to defendants' motion for summary judgment indicate the following. When appellant returned to his cell on November 28, 1972, after completing a work assignment as a commissary clerk and runner, he found the cell door ajar and

---

1. Joseph Coughlin, Acting Director of the Illinois Department of Corrections; John J. Twomey, Warden, Illinois State Penitentiary, Joliet Branch; and W. Rumley III and J. Robinson, prison guards.

2. Bonner brings this action under 42 U.S.C. § 1983:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Consti-

tution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Federal jurisdiction was supported by 28 U.S.C. § 1343(3). The action was originally brought *pro se.* Subsequently, counsel was appointed to represent Bonner, and an amended complaint was filed.

In addition to seeking damages, Bonner prayed for an injunction against the further use of shakedown searches without a search warrant, probable cause or the prisoner's consent, and a declaratory judgment holding such searches invalid.

his personal belongings strewn on the floor. The transcript of his trial was missing.[3] Another inmate, who witnessed the search, states that he saw two officers leave the cell carrying a large envelope.[4] Two other inmates described the extreme disarray.[5]

Defendants admit the shakedown of Bonner's cell by two guards, Rumley and Robinson, pursuant to a Department of Corrections Regulation authorizing such searches.[6] The record does not, however, explain who authorized the search or why it was made; the text of the regu-

3. Appellant swears that he reported the transcript missing to Lt. Gross on November 29, November 30, and December 1. Gross' affidavit states that he has no recollection of Bonner having made any complaint to him about officers Rumley and Robinson taking a transcript from his cell.

4. Willie Kimmons stated that the guards scattered all of plaintiff's belongings around the cell, and,

"When these Two Officers came out of Mr. Bonner['s], They had a Blanket and a Large Envelope, in which they threw the Blanket on the flag [cell floor], and went toward the Tower with the Large Envelope." R. 24.

5. Robert Walsh and Robert D. Daily, other prisoners, stated that the cell "looked as though a cyclone had hit [it]" and that "[i]t did indeed look as if [the guards] had gone in with one thought in mind and that being to completely tear the cell apart." Id.

6. Illinois Department of Corrections Administrative Regulation 401 provides, in pertinent part:

"II. Institutional Shakedowns
A. All areas of all institutions and facilities shall be thoroughly searched for contraband. Searches should be frequent and timed so that they cannot be anticipated by inmates. Before admitting an inmate to an unoccupied cell, it should be thoroughly searched.
B. When shaking down any area, you are to:
1. Glance over the entire area to detect evidence of anything unusual; if anything is noticed, proceed to examine that item or condition immediately.
2. Search all clothing in the area.
3. Inspect in, under, and in back of the washbowl. Look in any recess between the washbowl, the toilet, and the wall.
4. Examine shelves and all articles on them. Carefully inspect cans to make sure that they contain what they are supposed to. Squeeze tubes of cream or toothpaste to determine that no contraband is concealed in them.
5. Make certain that soap has not been hollowed out as a hiding place.
6. Carefully examine toilet paper containers and rolls.
7. Carefully inspect all walls. Be alert for evidence of mortar having been removed from anywhere in the wall.

8. Give careful attention to hot air registers or ventilating grilles. Make certain that nothing has been suspended by strings or threads in back of the grille.
9. Inspect radiators thoroughly; look between the fins; check behind and underneath the radiators.
10. If it is an 'outside' wall with exterior windows examine the window and window frame thoroughly to make sure that nothing is concealed in any recesses of the window or suspended outside the window.
11. Examine all window bars for evidence of tampering and, as with regular grille inspection, look along cross bars. Properly tap all bars to detect evidence of tampering.
12. If a bed has tubular legs and is not fastened, lift the leg and inspect the tubing to make sure that nothing has been hidden or suspended in the hollow legs. Look under the bed to make certain that nothing is suspended from the spring or mattress, or hidden in depressions in the metal frame.
13. Inspect all blankets, sheets, and mattresses.
14. At the slightest suspicion, examine the entire mattress. Be particularly alert to detect any cuts or tears in the covering, especially along the seams. If any evidence is found that the mattress might be used as a place for secreting contraband, remove the mattress for careful examination. Every mattress should be periodically examined with an electronic mattress frisker.
15. Open all lockers and examine all contents. Inspect the locker to make certain that no false bottoms have been provided or that no contraband is taped under the locker.
16. Completely remove all drawers from the lockers. Examine all contents and the drawers.
17. Inspect thoroughly all shoes. Look for signs of tampering with shoe heels or soles, commonly used for hiding hacksaw blades, narcotics, or other contraband.
18. Carefully inspect the entire floor of the area to detect any tampering.
19. Inspect all envelopes, books, magazines, or packages only for the purpose of determining if any contraband has been concealed therein.
III. Destruction of Personal Property
1. During any search all contraband found is to be confiscated, recorded, and reported to a supervisory officer.

lation implies that such searches are made periodically without any advance notice for security reasons.

Defendant Rumley filed an affidavit denying that *he* took Bonner's transcript or that he threw Bonner's personal property on the floor.[7]  Robinson, who is no longer employed at the institution, did not file any affidavit.[8]  Thus, the possibility that Robinson took Bonner's transcript is not contradicted in any affidavit filed on behalf of defendants.  Nor have defendants denied the allegation that the guards left the cell door open, thus creating the possibility that another person may have taken the transcript.

At the time of the search, Bonner's appeal from his conviction was pending in the Illinois Appellate Court.  He was then represented by counsel who had possession of both a copy of the trial transcript and the common law record.  The murder conviction was affirmed on May 29, 1973.  12 Ill.App.3d 245 (1973) (abstract opinion).  This action was commenced on June 7, 1973; some months later, on December 5, 1973, after counsel had been appointed to represent appellant, he was given a substitute copy of his trial transcript.

On these facts the district court held that Bonner had no right to relief against these defendants.  He held that Bonner had suffered no compensable injury and, alternatively, that even if the defendant guards were "overzealous," their reliance on a valid prison regulation established a good faith defense.

We cannot accept the district court's rationale.  The prison regulation, by its terms, would not justify the deliberate taking of an inmate's personal property,[9] and, therefore, without a resolution of the disputed issues of fact, a good faith defense is not necessarily available either to Robinson, who has not denied the taking, or to Rumley, whose version of the event is contradicted in material respects by other affiants.[10]  Moreover, the possibility that Bonner's status as a litigant was adversely affected is not entirely foreclosed by the record.  *See* n. 29, *infra.*  And, in all events, we cannot say that the deliberate taking of an inmate's possessions, which he may value disproportionately to their price on the open market, could not under any circumstances give rise to monetary recovery or an injunction against repetition of such conduct.[11]  We therefore must address the merits of his underlying claims.

I.

Appellant argues that the regulation which authorized the search of his cell is

---

2. It is important and essential that searches be systematic and do not result in damage, loss, or abuse to any inmate's personal property.  Deliberately damaging, confiscating, or abusing any inmate's permitted personal property will result in disciplinary action against the offending employee.
3. After a search, living units are to be left in as near the same condition as found upon entering as possible."

7. He stated, in part:

"I emphatically deny that on November 28, 1972, I took a trial transcript from the cell of Alonzo Bonner."

8. The record does disclose that Robinson was served with a summons and a copy of the complaint.  In his motion to dismiss and motion for summary judgment, the Illinois Attorney General stated that he is representing all defendants herein.

9. Paragraph III. 2. states:

"Deliberately damaging, confiscating, or abusing any inmate's permitted personal property will result in disciplinary action against the offending employee."
*See* n. 6, *supra.*

10. With respect to Bonner's prayer for an injunction against the carrying out of shakedown searches without probable cause, a warrant, or the prisoner's consent, the guards' good faith compliance with a regulation authorizing such searches is simply irrelevant.

11. A claim for $3.52, Weddle v. Director, Patuxent Institution, 436 F.2d 342 (4th Cir. 1970), rev'd, 405 U.S. 1036, 92 S.Ct. 1318, 31 L.Ed.2d 577, or for seven packages of cigarettes, Russell v. Bodner, 489 F.2d 280 (3rd Cir. 1973), is apparently sufficient.  As Bonner notes, the mere difficulty in valuing the loss cannot serve *to deny the right of recovery.  Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 565–566, 51 S.Ct. 248, 75 L.Ed. 544; *Exercycle of Michigan, Inc. v. Wayson*, 341 F.2d 335 (7th Cir. 1965).

unconstitutional on its face because it requires neither notice, probable cause, nor a warrant before a shakedown is conducted, and also because it does not effectively prevent the reading of an inmate's private papers. We reject this attack.

■■■ The amended complaint does not allege that the guards examined any confidential documents belonging to Bonner or, indeed, that he had any such papers in his cell. Quite clearly, Bonner has no standing to attack the regulation simply because it may be improperly applied to someone else. United States v. Ramsey, 503 F.2d 524, 526–527 (7th Cir. 1974). It is equally clear that the Constitution does not foreclose every invasion of a prisoner's privacy that does not satisfy the warrant procedure described in the second clause of the Fourth Amendment.[12] *Compare* United States v. Biswell, 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87. We therefore limit our analysis to the specific search and seizure conducted on November 28, 1972.

The threshold question is whether the Fourth Amendment provides any protection at all to a person incarcerated as a result of conviction of a serious crime. It might be argued that a prisoner can have no reasonable expectation of privacy with respect to his cell and therefore that the Fourth Amendment is completely inapplicable. *See* United States v. Hitchcock, 467 F.2d 1107, 1108 (9th Cir. 1972), cert. denied, 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279. *Contra,* United States v. Savage, 482 F.2d 1371, 1373 (9th Cir. 1973), cert. denied, 415 U.S. 932, 94 S.Ct. 1446, 39 L.Ed.2d 491. Or, alternatively, we might take judicial notice of the need for constant surveillance and control in a prison society and presume that any established practice designed to promote the discipline of the institution will satisfy the Fourth Amendment's requirement of reasonableness. *See*

Stroud v. United States, 251 U.S. 15, 21–22, 40 S.Ct. 50, 64 L.Ed. 103; *see also* United States v. Palmateer, 469 F.2d 273, 274 (9th Cir. 1972); *cf.* Daughtery v. Harris, 476 F.2d 292, 294–295 (10th Cir. 1973); Denson v. United.States, 424 F.2d 329, 331 (10th Cir. 1970). We are persuaded, however, that the possible application of some measure of Fourth Amendment protection within a prison context may not be. summarily rejected.

The Supreme Court has recently reminded us that there "is no iron curtain drawn between the Constitution and the prisons of this country." In Wolff v. McDonnell, speaking for a unanimous Court, Mr. Justice White said:

Petitioners assert that the procedure for disciplining prison inmates for serious misconduct is a matter of policy raising no constitutional issue. If the position implies that prisoners in state institutions are wholly without the protections of the Constitution and the Due Process Clause, it is plainly untenable. Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a "retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country. Prisoners have been held to enjoy substantial religious freedom under the First and Fourteenth Amendments. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). They retain right of access to the courts.

12. The Fourth Amendment reads as follows: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall

issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), aff'g Gilmore v. Lynch, 319 F.Supp. 105 (ND Cal.1970); Johnson v. Avery, [393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)]; Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race. Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). Prisoners may also claim the protections of the Due Process Clause. They may not be deprived of their life, liberty, or property without due process of law. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

418 U.S. 539, 555–556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935.

This conceptual development had been foreshadowed by the Court's analysis in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484. The rationale in *Morrissey* had convinced us that inasmuch as physical confinement is merely one species of legal custody,

> liberty protected by the due process clause may—indeed must to some extent—coexist with legal custody pursuant to conviction. The deprivation of liberty following an adjudication of guilt is partial, not total. A residuum of constitutionally protected rights remains.

> As we noted in Morales v. Schmidt, [489 F.2d 1335, 1338 (7 Cir. 1973)], the view once held that an inmate is a mere slave is now totally rejected. The restraints and the punishment which a criminal conviction entails do not place the citizen beyond the ethical

tradition that accords respect to the dignity and intrinsic worth of every individual.

United States ex rel. Miller v. Twomey, 479 F.2d 701, 712 (7th Cir. 1973) (footnotes omitted).

Respect for the dignity of the individual compels a comparable conclusion with respect to his interest in privacy. Unquestionably, entry into a controlled environment entails a dramatic loss of privacy. Moreover, the justifiable reasons for invading an inmate's privacy are both obvious and easily established. We are persuaded, however, that the surrender of privacy is not total and that some residuum meriting the protection of the Fourth Amendment survives the transfer into custody.

This conclusion finds some support, not only in the Court's recognition of other constitutional protections, but also in the care with which the Court has avoided a total rejection of the applicability of the Fourth Amendment to a prisoner's interest in privacy. In the *Stroud* case, for example, the Court concluded that there was no unreasonable search and seizure in violation of the prisoner's constitutional rights since the delivery of his mail to the warden was in accord with a regular practice "*reasonably* designed to promote the discipline of the institution." 251 U.S. at 21–22, 40 S.Ct. at 53 (emphasis added). It is true, as defendants point out, that in *Lanza v. New York* the Court noted that

> it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day.

370 U.S. 139, 143, 82 S.Ct. 1218, 1221, 8 L.Ed.2d 384 (footnote omitted).[13] But it is equally true that the case was decided on a different ground[14] and three mem-

---

**13.** In this connection, the Court specifically referred to the N.Y. State Commission of Correction, Regulations for Management of County Jails rule that provided, "All parts of the jail should be frequently searched for contraband." 370 U.S. at 143 n. 14, 82 S.Ct. at 1221. At issue in *Lanza* was the use of evidence of a

conversation, held in the visiting room of a prison between an inmate and his brother, that was surreptitiously electronically recorded.

**14.** For purposes of decision, the Court assumed that the room at the jail where the petitioner and his brother conversed was an

bers of the Court objected to the unnecessary comment on the constitutional problem.[15]

It is also true that the Tenth Circuit has upheld serious intrusions on a prisoner's privacy in the face of a Fourth Amendment attack. *See, e. g.,* Daughtery v. Harris, 476 F.2d 292, 294–295 (1973). But that court did not deny the relevance of the Fourth Amendment; quite the contrary, it assumed that "clear abuse or caprice" or "a showing of wanton conduct" would override the institutional interest, and actually held only that on the facts before it "the rectal searches in question were, and are, a necessary and reasonable concomitance of appellants' imprisonment." *Id.* at 295. Thus, although the holding was not stated in these words, the court decided that there was no violation of the litigants' right "to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures." (Emphasis added.)

■■ We hold that a prisoner enjoys the protection of the Fourth Amendment against unreasonable searches, at least to some minimal extent. We need not decide in this case, however, whether the mere existence of a prison regulation authorizing random shakedowns would be sufficient to overcome a prisoner's Fourth Amendment attack, or whether some additional data describing the routine, its necessity, and the conformity of the particular search to the routine might be needed to satisfy the appropriate test of reasonableness. For in this case Bonner has alleged that the search was impermissible only insofar as it was conducted without a warrant, probable cause, or his consent. Amended Complaint paragraph 8. We are certain that, whatever the level of the prisoner's Fourth Amendment protection, it does not rise to that possessed by the unincarcerated members of society.[16]

■ Bonner has, however, stated a Fourth Amendment claim with respect to the seizure of his state court transcript. As we noted at p. 1314, *supra,* he is entitled to be compensated for its loss regardless of its limited and uncertain monetary value. Assuming, as we must on review of a summary judgment, that Bonner is able to prove the taking of his property by one of the prison guards, the defendants would then have the burden of establishing the "reasonableness" of the seizure. For surely the term "papers and effects" encompasses the transcript of Bonner's criminal trial. Appellant has, therefore, alleged a Fourth Amendment violation which must be tried.[17]

area immunized by the Constitution from unreasonable search and seizure, 370 U.S. at 144, 82 S.Ct. 1218, 8 L.Ed.2d 384, but held that his conviction did not depend on the use of his intercepted conversations.

**15.** *See* the opinion of Mr. Justice Brennan with whom Chief Justice Warren and Mr. Justice Douglas joined, 370 U.S. at 150, 82 S.Ct. 1218, 8 L.Ed.2d 384. It is also noteworthy that neither Mr. Justice Frankfurter nor Mr. Justice White participated in the majority opinion.

**16.** To the extent that Bonner argues that Regulation 401 *see* n. 6, *supra,* is unconstitutional because it authorizes such searches without warrants or probable cause, and he seeks an injunction against the future conduct of searches under such circumstances, the question arises as to whether or not a three-judge court should have been convened under 28 U.S.C. § 2281. As the regulation herein was promulgated by the Illinois Department of Corrections, rather than by the warden of a single prison, we cannot rely on Wolff v.

McDonnell, 418 U.S. 539, 542 n. 1, 94 S.Ct. 2963, 41 L.Ed.2d 935 for the conclusion that the regulation does not have a statewide impact. The record does not disclose the number of institutions affected by the regulation; consequently, we are unable to apply the guidelines set forth in Board of Regents v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697.

We do not believe, however, that Bonner's claim meets another of the requirements for applying § 2281. His contention does not present a substantial enough question to warrant the convening of a three-judge court. We deem his argument "obviously without merit" within the meaning of Goosby v. Osser, 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 and Wojcik v. Levitt, 513 F.2d 725, at 727–728 (7th Cir., 1975).

**17.** *See* Carroll v. Sielaff, 514 F.2d 415, at 417 (7th Cir., 1975); Watson v. Stynchombe, 504 F.2d 393 (5th Cir. 1974); Russell v. Bodner, 489 F.2d 280 (3rd Cir. 1973); Cruz v. Cardwell,

## II.

In his amended complaint, Bonner alleged in the alternative that defendants Rumley and Robinson "made it possible, by leaving the door of Plaintiff's cell open, for others without authority to remove Plaintiff's trial transcript from the cell." [18] Although the pleading does not allege that the guards were negligent in failing to close the cell door after completing their search, appellate counsel contends that this alternative claim is sufficient on a negligence theory. In briefs submitted after argument, the parties have argued the question whether mere negligence may support a recovery under § 1983.

We do not think the broad, and somewhat abstract, question whether negligence by the defendant may ever be sufficient to justify relief in a § 1983 case need be decided on this appeal. We may assume, for example, that prolonged detention in prison as the result of simple negligence on the part of the jailer would establish a prima facie case of deprivation of liberty protected by the Fourteenth Amendment,[19] or, conversely, that negligent failure to prevent one inmate from harming another would not constitute cruel and unusual punishment prohibited by the Eighth Amendment.[20] The first question to be asked is not what kind of conduct will breach the defendants' duty under § 1983, but rather, precisely what is that duty? [21]

The statute protects the plaintiff from "the deprivation of any rights, privileges, or immunities secured by the Constitution . . .." The constitutional right invoked by plaintiff's alternative argument, as we understand it, is the Fourteenth Amendment right not to be deprived of property without due process of law. Bonner's transcript is certainly "property" within the meaning of the Fourteenth Amendment; moreover, if we assume the truth of his alternative allegation, he was deprived of that property as a consequence of the defendants' negligence. Since it is undisputed that the guards acted "under color of" a state regulation, it would seem to follow that these elements of the constitutional violation have been alleged. Prior to Lynch v. Household Finance Corp., 405 U.S. 538, 542–552, 92 S.Ct. 1113, 31 L.Ed.2d 424, the claim would have been defeated by the distinction between "personal" rights and "property" rights. See Hague v. CIO, 307 U.S. 496, 531, 59 S.Ct. 954, 83 L.Ed. 1423. Alternatively, prior to Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, the claim might have failed on the theory that unauthorized acts of prison guards should not be treated as acts "under color of" state law. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, Mr. Justice Harlan concurring at 192, 81 S.Ct. at 486. Now, however, it is clear that the actions of the guards constituted a form of state action sufficient to bring the protection of the Fourteenth Amendment into play.

What is less clear is whether it can be said that the deprivation was "without due process of law." The Lynch case involved a challenge to Connecticut's pre-judicial garnishment procedure. There was no conduct by any Connecticut official that was not expressly authorized by the state through its garnishment statutes. The temporary impairment of the plaintiff's access to her bank account resulted in an injury sufficiently

---

486 F.2d 550 (8th Cir. 1973); Gibson v. City of Seattle (Washington) Dept. of Police, 472 F.2d 1220 (9th Cir. 1973).

**18.** Amended Complaint paragraph 14.

**19.** Whirl v. Kern, 407 F.2d 781, 790 (5th Cir. 1968).

**20.** Gutierrez v. Department of Public Safety, 479 F.2d 701, 721 (7th Cir. 1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102.

**21.** As Professor Nahmod has written:

"Notions of negligence and intentional conduct tend to obscure the threshold concern in 1983 cases. That concern should be whether a constitutional duty derived from the fourteenth amendment has been breached." S. Nahmod, "Section 1983 and the 'Background' of Tort Liability," 50 Ind. L.J. 5, 23 (1974).

serious to justify an immediate determination of the constitutionality of the state procedure.[22]

■ It seems to us that there is an important difference between a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the misconduct of state officers. In the former situation the facts satisfy the most literal reading of the Fourteenth Amendment's prohibition against "State" deprivations of property; in the latter situation, however, even though there is action "under color of" state law sufficient to bring the amendment into play, the state action is not necessarily complete. For in a case such as this the law of Illinois provides, in substance, that the

plaintiff is entitled to be made whole for any loss of property occasioned by the unauthorized conduct of the prison guards.[23] We may reasonably conclude, therefore, that the existence of an adequate state remedy to redress property damage inflicted by state officers avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment.[24]

■ This is not to suggest that the plaintiff in a § 1983 action must exhaust his state remedies before seeking federal relief. Rather, it seems to us that the availability of an adequate state remedy for a simple property damage claim avoids any constitutional violation.[25]

**22.** "The District Court found that access to funds held in a savings account was indistinguishable from simple ownership of money. Thus garnishment of that account did not infringe personal rights. Mrs. Lynch, however, alleged that because of the garnishment she was unable to pay her rent on time and encountered difficulty maintaining her family on a minimally adequate diet. If these allegations are true, Mrs. Lynch's personal liberty could be profoundly affected by garnishment of her savings." 405 U.S. at 552 n. 21, 92 S.Ct. at 1122.

**23.** Article 13, § 4 of the 1970 Illinois Constitution, S.H.A., has waived any defense based on sovereign immunity in an action against the state, effective January 1, 1972, "[e]xcept as the General Assembly may provide by law . . . ." The Illinois General Assembly has elected to retain the defense of sovereign immunity "[e]xcept as provided in 'An Act to create the Court of Claims, to prescribe its powers and duties, and to repeal An Act herein named' . . . ." Ill.Rev.Stat.1973, ch. 127, § 801. Section 8(d) of the Court of Claims Act, as amended, provides Bonner with a right of recovery against the state, up to $100,000, for the negligent acts of state employees. Ill.Rev.Stat.1973, ch. 37, § 439.8(d). In addition, the individual defendants appear to possess no state immunity that would prevent their being sued in the Illinois circuit courts. Cf. Kelly v. Ogilvie, 35 Ill.2d 297, 220 N.E.2d 174 (1966).

**24.** Even in cases in which the state has the opportunity to choose between holding a hearing before any taking of property occurs or postponing the hearing until after the taking, the requirements of the Due Process Clause

may, in some situations, be met. See opinion of Mr. Justice White in Arnett v. Kennedy, 416 U.S. 134 at 178–179, 94 S.Ct. 1633, 40 L.Ed.2d 15; note particularly his reference (in n.6 at 178) to the distinction between the requirements of due process where property interests are at stake and the entirely separate matter of determining the requirements of due process when a person is deprived of liberty. Here, however, there is no possible way in which a state could afford a hearing to a citizen in advance of an unanticipated negligent act by a state agent; necessarily—unless the Due Process Clause is construed to impose an impossible standard—the post-incident hearing provided by the state judicial machinery must be sufficient to meet the demands of due process.

**25.** Under this reasoning, this case is comparable to a condemnation by the state with compensation to the owner deferred until after the property has changed hands. As long as the state remedy is adequate, and the recovery includes compensation for the use as well as the value of the property, there would seem to be no violation of the Fourteenth Amendment. Compare the following cases cited by Mr. Justice White in Arnett v. Kennedy, supra, 416 U.S. at 178–179, 94 S.Ct. at 1656:

"See North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (seizure of food unfit for consumption); Central Union Trust Company v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403 (1921) (seizure of property under Trading with the Enemy Act); Corn Exchange Bank v. Coler (Commissioner of Public Welfare), 280 U.S. 218, 50 S.Ct. 94, 74 L.Ed. 378 (1930) (seizure of assets of an absconding husband); Phillips v. Commissioner of Internal Revenue, 283 U.S.

This result is entirely consistent with the basic statutory purposes as explained in Monroe v. Pape.[26] There is simply no need to provide a federal tort remedy for property damage caused by the negligence of state agents if a state remedy is not only adequate in theory but also readily available in practice.

■ This analysis is consistent with the fact that the federal remedy provided by § 1983 is supplementary to whatever state remedy may exist for constitutional violations. The comment to that effect in Monroe v. Pape rested on the premise that a constitutional violation had occurred;[27] in that situation the availability of a state remedy could not foreclose the supplementary federal remedy. In this case, however, we are persuaded that the availability of traditional and adequate state procedures for the redress of ordinary property damage tort claims forestalls the conclusion that there has been any deprivation of plaintiff's property without due process of law within the meaning of the Fourteenth Amendment. In short, no federal right was violated by defendants' alleged negligence.

We therefore conclude that plaintiff's alternative theory of recovery must fail

because he has not alleged the breach of a constitutional duty derived from the Fourteenth Amendment.

## III.

■ Bonner also contends that the loss of his transcript interfered with his right of access to the Illinois courts. It is clear that defendants owed him a constitutional duty not to abridge such access.[28] It follows that they may well have owed him a higher degree of care to avoid the loss of his trial transcript than the duty they owed to him with respect to other items of personal property.

■ We may assume, as Adams, Sigafus, and DeWitt, supra n. 28, indicate, however, that an intentional taking of a prisoner's legal materials that results in an interference with his access to the courts violates this duty. Thus, with respect to the seizure of his transcript by the prison guards, Bonner has stated, assuming his ability to demonstrate such an interference, a Fourteenth Amendment cause of action as well as the Fourth Amendment claim discussed in section I, supra.

The district court did not have occasion to consider whether, on Bonner's al-

---

589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (collection of a tax); Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (setting of price regulations); Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947) (appointment of conservator of assets of savings and loan association); Ewing v. Mytinger and Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of misbranded articles in commerce). While these cases indicate that the particular interests involved might not have demanded a hearing immediately, they also reaffirm the principle that property may not be taken without a hearing at some time."

26. Justice Douglas explained that a reading of the entire debates preceding the enactment of the Ku Klux Act of 1871 identified three main aims:

"First, it might, of course, override certain kinds of state laws. * * *

"Second, it provided a remedy where state law was inadequate. * * *

"But the purposes were much broader. The third aim was to provide a federal remedy where the state remedy, though adequate

in theory, was not available in practice." 365 U.S. at 173–174, 81 S.Ct. at 477.

27. "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court." 365 U.S. at 183, 81 S.Ct. at 482.

But in this case the fact that Illinois stands ready to return plaintiff's property or its economic equivalent is inconsistent with the conclusion that it has finally deprived plaintiff of that property without due process of law.

28. See Johnson v. Avery, 393 U.S. 483, 485, 89 S.Ct. 747, 21 L.Ed.2d 718; Adams v. Carlson, 488 F.2d 619, 632–634 (7th Cir. 1973); Sigafus v. Brown, 416 F.2d 105, 107 (7th Cir. 1969); DeWitt v. Pail, 366 F.2d 682, 685–686 (9th Cir. 1966).

ternative theory of the facts, the defendants breached this noninterference duty by leaving the cell door open, enabling some unknown person to take the transcript. Instead, the judge held that on the facts Bonner would be unable to demonstrate any such interference. We disagree. Bonner's verified complaint indicates the existence of a serious factual dispute in this regard.[29]

Until we know whether there has been an interference with Bonner's constitutionally protected right of access to the courts, it is premature to express a somewhat abstract opinion on what kind of knowledge or intent on the part of the officers would make such interference actionable under § 1983.[30] Important and difficult constitutional questions should not be decided unnecessarily and are best evaluated against the background of a specific factual setting. Since the facts will be developed at trial in all events, the legal determination can be made more reliably after those actual facts have been found.

The summary judgment is vacated and the case is remanded for further proceedings.

FAIRCHILD, Chief Judge (concurring).

With respect to Part I of the opinion of the court, I agree that Bonner has stated a cause of action for the seizure of his transcript. I would predicate the cause of action upon the due process clause of the Fourteenth Amendment, and not reach the question whether an incarcerated individual is entitled to Fourth Amendment protection of his interest in privacy. See, however, Hansen v. May, 502 F.2d 728, 730 (9th Cir. 1974).

With respect to Part II of the opinion, I agree that Bonner's claim that the negligence of the guards caused the loss of his property is not an adequate claim under 42 U.S.C. § 1983. I would base this result on the proposition that the negligence of a state employee which causes loss of property is not state action which deprives the owner of property under the Fourteenth Amendment, nor is it, under § 1983, action under color of state law subjecting the plaintiff to such deprivation. The availability of a state remedy in damages seems to me to be irrelevant to the existence of § 1983 liability. See Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Chevigny, Section 1983 Jurisdiction: A Reply, 83 Harv.L.Rev. 1352 (1970).

---

**29.** The trial judge noted that Bonner's appeal to the Illinois Appellate Court was pending at the time of the shakedown, that he was then represented by counsel, and that counsel had possession of both a copy of the transcript and the common law record. Moreover, he observed that Bonner was also in possession of copies of the common law record and of the briefs and abstracts filed in the Illinois Circuit Court, and that he was eventually provided a copy of the transcript by these defendants.

Bonner counters by stating that the Illinois Appellate Court affirmed his conviction on May 29, 1973 (12 Ill.App.3d 245 (1973)), after which he had only 56 days to seek the discretionary review of the Illinois Supreme Court (Ill.Rev.Stat.1973, ch. 110A, § 315). He was not supplied a copy of the transcript until December 5, 1973. He argues that he was hampered in filing the necessary documents by the absence of the full transcript. In addition, he contends that the loss further interfered with his filing of a petition for postconviction relief under Illinois law (Ill.Rev.Stat.1973, ch. 38 § 122–1 et seq.).

Defendants respond that Bonner could well have filed the necessary documents to institute these proceedings without his transcript. While as a theoretical matter we may agree, we believe Bonner has a right to try to prove that the transcript disappearance sufficiently interfered with his effective exercise of his rights under Illinois law to give rise to a damage recovery. We cannot conclude, as the district judge apparently did, that, as a matter of law, the affidavits disclose that Bonner's right of access to the Illinois courts was not qualitatively, if not quantitatively, affected.

**30.** As each of the cases cited in n. 28, *supra,* involved intentional conduct which clearly violated such duty, there was no occasion in those cases to address the question whether any lesser degree of *mens rea* would suffice.