Clarence V. SAUNDERS et al.

v.

Israel PACKEL et al.

Civ. A. No. 74–385.

United States District Court, E. D. Pennsylvania.

June 30, 1977.

Lisa Pollak, Indigent Prisoner Litigation Program, Barbara Sarshik, University of Pa. Law School, Philadelphia, Pa., for plaintiffs.

Michael Minkin, Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Invoking 42 U.S.C. § 1983 and 28 U.S.C. § 1343(4), ten present and former inmates of the State Correctional Institution at Graterford filed this action seeking damages and injunctive relief against Stewart Warner, Commissioner of the Pennsylvania Bureau of Correction when this action was filed, and Robert L. Johnson, the Superin-tendent of the prison at the time of the incidents in issue. Joined as defendants for purposes of injunctive relief are Julius Cuyler, the present Superintendent, and William H. Robinson, the present Commissioner. The plaintiffs claim that two separate prison-wide lockups violated their Fourteenth Amendment rights to both procedural and substantive due process of law, and that the cell searches conducted incident to both lockups violated the Fourth Amendment rights secured to them by the Fourteenth Amendment. On a record consisting of a comprehensive stipulation of facts and various depositions, affidavits, answers to interrogatories and documents, plaintiffs and defendants have filed cross-motions for summary judgment. As to the procedural and substantive due process issues we grant the defendants' motion for summary judgment and deny the plaintiffs' motion. With respect to the cell search issue we deny both motions and the case must proceed to trial.

### I.

On September 16, 1973 at about 7:00 P.M. a Graterford employee was slain in the kitchen area. The Pennsylvania State Police were summoned to the prison, and they immediately commenced an investigation of the murder. The investigation focused on Albert Ford and Anthony Schilling, the only two inmates who were in the kitchen area at the time of the murder. Defendant Johnson promptly exercised his authority to order a prison-wide lockup of all inmates to search for weapons and contraband. In a press release issued the following day the Superintendent explained:

A number of inmates are being interrogated. Investigation so far indicates that this was an isolated incident but because of the gravity of this event and the finding of a number of homemade knives in the institution as well as a need to facilitate the investigation, most inmates will be confined to their cells until further notice.

On September 19 the authorities filed a criminal complaint against Albert Ford,

charging him with the kitchen murder, and on September 20 he was arraigned in state court and the eyewitness inmate Schilling was transferred to another state prison for his protection. Meanwhile, the ongoing cell-to-cell search was completed on September 20.

On September 21, 1974 all non-supervisory prison guards staged a walkout in protest of various conditions of their employment. The guards presented the Commonwealth with a list of twenty-six demands. Although the nature of the demands was varied, the dominant theme related to the security of the guards from inmate assault. Included among their list of grievances were demands that:

1. The lockup be continued until the slain prison guard was buried.
2. Inmates be double-locked in cells when they are charged with misconduct or when they are involved in a fight.
3. Guards be given permission to carry mace.
4. The Bureau of Prisons commit itself to hiring fifty new guards at Graterford.
5. State police remain at the Institution until it was deemed "safe".
6. The Institution adopt a policy for the controlled movement of prisoners and a "continuing search" of the prison.
7. The Pennsylvania Department of Justice sponsor legislation that would impose a ten-year prison sentence on any prisoner who is discovered to have a knife on his person or in his cell.

After approximately twenty-four hours, the guards returned to their posts. On September 26, 1973 a Memorandum of Understanding was signed by prison authorities and representatives of the guards. The Bureau agreed to many of the guards' demands and promised to discuss the others. Specifically, it was agreed that the State Police would remain at the prison pending a final decision by the Commissioner following an on-the-scene assessment of the situation and consultation with Superintendent Johnson. In addition, the Bureau agreed to "work out a system to assure that a continuing search of the residents and institution is ongoing." (Stipulations of Fact, ¶ 30(s)).

Notwithstanding that the guards returned to duty on September 22 and that the systematic cells searches were completed on September 20, the lockup continued until September 26; thus the lockup lasted a total of ten days and four days beyond the termination of the prison guards walkout.

During the ten-day lockup, the conditions of confinement were significantly altered. Even though Graterford is a maximum security prison, the inmates, particularly those in the general population, endured significant restrictions on the living conditions that customarily prevailed. In confining the prisoners to their cells, the prisoners engaged in no exercise, they were not permitted to shower, to work at their prison job (although they received their regular pay), or to participate in religious and educational programs. Although the prisoners continued to receive three meals a day, the meals were served in the cells and during the first several days breakfast consisted of a roll, coffee and milk, and lunches and dinners were sandwiches. Later on, frozen dinners were served. No visitors were received from September 16 to September 18 and visits with other inmates were limited to thirty minutes. Medical care was also limited. Only emergency care was provided, and some inmates did not receive their regular medication. Furthermore, the inmate complaint procedure was modified. Ordinarily, an inmate could make a complaint to the authorities by depositing a written complaint in a locked box placed in each cell block. During the lockup, however, complaints had to be orally communicated to the correctional officers in the cell block. Plaintiff James Glover, who had no teeth and was on a special soft-food diet, received the same food as other inmates.

In effecting and continuing the lockup, Superintendent Johnson made no written report documenting the reasons for initiating and continuing the lockup, nor the con-

ditions that prevailed during the lockup. No records were made of property that was seized, the identity of the guards participating in the lockup, nor, for that matter, was any information compiled concerning the lockups and searches. No hearing was held at any time for the purpose of giving inmates an opportunity to be heard with respect to the initiation and continuation of the lockup, the need for cell searches, the manner of conducting them, or the propriety of seizing certain property.

Several months later, on January 8, 1974, Superintendent Johnson ordered a second lockup. It is stipulated by the parties that no particular incident triggered the decision, instead it was apparently a policy judgment made by Johnson. The conditions of this second confinement were substantially identical to the first. Again a systematic cell-to-cell search for weapons was conducted and again no procedural safeguards were accorded to the prisoners. This prison-wide confinement ended on January 11, 1974 after four days. The January lockup was the first such confinement since 1942 that was precipitated by no identifiable incident that could be construed as a threat to prison security or discipline. Prior lockups always had been preceded by such incidents as fights among inmate factions or inmates and guards, a disturbance in the Behavioral Adjustment Unit, or a general work stoppage by inmates.

## II.

In ruling on these motions, we recognize at the outset that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Prison administrators are charged with the delicate task of punishing and rehabilitating those persons who, in the words of Chief Justice Burger, "have demonstrated their inability, or refusal, to conform their conduct to the norms demanded by a civilized society." *Jones v. North Carolina Prison-*

ers' Labor Union, —— U.S. ——, ——, 97 S.Ct. 2532, 2544, 53 L.Ed.2d 629 (1977) (Concurring opinion). In addition, the federal constitution imposes few substantive restrictions on the states in determining the degree of liberty of which they may deprive prisoners. Given the difficulty of responsibly discharging their duties as prison, administrators and the wide leeway granted them by the Constitution, federal courts must give "appropriate deference . . . and appropriate recognition to the peculiar and restrictive circumstances of penal confinement." *Jones, supra* at —— — ——, 97 S.Ct. at 2538.

On the other hand, inmates are not shorn of all constitutional rights at the prison gate. A developing constitutional jurisprudence has established that prisoners retain a residue of their First Amendment liberty interests in free speech, *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), and in freedom of religion, *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1971) (per curiam). In addition, many courts have recognized that a prisoner retains a modicum of protection against unreasonable searches and seizures. *E. g., Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir. 1975) (Stevens, J.). Invidious racial discrimination in state prisons is forbidden by the equal protection clause of the Fourteenth Amendment, *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). Further, the Supreme Court has recognized a substantive liberty interest emanating from the due process clause ensuring that prisoners be given access to the courts. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). And it is now settled that some appropriate process is due prisoners before the authorities may deprive inmates of liberty or property interests, whether those interests find their source in the federal constitution or in state law. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Against this backdrop, we must resolve the plaintiffs' claims.

## III.

 The due process clause of the Fourteenth Amendment is triggered only if plaintiffs have been deprived of a liberty or property interest. *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The parties in their briefs pay scant attention to this issue. There is no disagreement among the parties concerning the conditions generally prevailing during both lockups. Prisoners in the general population generally enjoyed a degree of free movement, which was drastically curtailed during the lockup. Exercise, personal hygiene, routine medical attention, and self-improvement, work, religious worship and visitation opportunities were either eliminated or severely limited during both lockups. We do not understand the plaintiffs to argue that the source of their liberty interest is the federal constitution. Indeed it is doubtful, to say the least, that the Eighth Amendment prohibition against cruel and unusual punishment would prevent a state from adopting a blanket policy of confining all prisoners in its maximum security prisons to their cells under conditions similar to those involved here. Rather, plaintiffs are claiming that their liberty interest arises from state law and the practice of committing individual prisoners to administrative segregation only in the event of a severe disciplinary infraction and ordering general lockups only in the event of a serious threat to the security of the institution. At the time that both the 1973 and 1974 lockups were ordered, there was no written statutory or administrative directive governing the practice. The decision to institute a lockup was a concededly unusual one that apparently was entrusted to the discretion of the warden and the Bureau of Correction. And at least until the last four days of the 1973 lockup, the practice had been to order a prison-wide lockup only in circumstances that posed a threat to prison security. Given this practice, prisoners in the general population, particularly those whose prison conduct has been exemplary, have a reasonable expectation, rooted in the past practice of state prison authorities, that they will not be confined indiscriminately to their cells absent some situation that poses a danger to the smooth functioning of the prison. At least on the record we have before us, plaintiffs were deprived of liberty interest that is entitled to the protection of the Fourteenth Amendment.

## IV.

 We now address the substantive due process claim. Plaintiffs claim, in essence, that the decision to institute and continue both lockups was so devoid of factual support as to deprive them of their liberty without due process of law. Initially, we do not understand the plaintiffs to argue that the initiation of the 1973 lockup was arbitrary or irrational. Clearly, upon discovering that a prison employee had been stabbed to death apparently by inmates, the warden had a valid reason for locking up the entire prison population. At a minimum, there was a serious crime crying to be solved and fast action was vital. Isolation of the inmates would facilitate the investigation, which, for all the prison officials knew, could have signalled an incipient insurrection. Moreover, by locking prisoners in their cells, more manpower could be devoted to the immediate task of evaluating the situation and beginning the investigation. Also, the decision was made to commence a cell search for weapons, such as the one used to kill the cook, and other contraband, and Fourteenth Amendment notions of fundamental fairness and rational decision making are no impediment to the warden's decision to accomplish that search by locking all prisoners in their cells until the search was completed. Even more compelling is the defendants' argument that the continuation of the lockup was justified by the guards' walkout on September 21, 1973. Chaos could have resulted had the lockup not been continued until the guards returned.

Only the period between September 22, when the guards returned, and September 26 when the lockup ended, presents a substantial claim. In light of the events of the preceding week, we cannot lightly dismiss

the defendants' concern for the security of the institution during those four days. True enough, the cell searches had been completed, the murderer apprehended and the guards had returned to duty, but we believe that four days was not an inordinate length of time to continue the lockup to ensure that the institution had returned to normalcy. A maximum security prison is such a volatile institution, that we think a confinement of this duration is not one that should be subject to searching constitutional scrutiny where there exists a rational basis for it. *Jones v. North Carolina Prisoners' Union, supra* at ——, 97 S.Ct. 2532. The defendants' response to the exigencies of the situation was not so exaggerated as to warrant judicial interference with the judgment of prison administrators on how best to run their prison. Just as the prisoners have a reasonable expectation to a modicum of freedom during uneventful periods in their imprisonment, so also must they expect that their limited freedom will be curtailed not only during times of indisputable crises but also for reasonable periods thereafter as a precautionary measure.

■ The plaintiffs' claim with respect to the January 1974 lockup fares no better. This was the first lockup in recent history at Graterford that was not prompted by any particular incident that could be construed as a threat to security. The sole purpose of this four-day lockup was to conduct a cell-to-cell search for weapons and contraband. The purpose was clearly a legitimate one, particularly in view of the September murder and the prison guards' insistence on more frequent cell searches. Moreover, regulations promulgated by Bureau of Corrections in April 1973 imposed upon the warden a duty periodically to search inmates and their cells for contraband. 37 Pa.Code § 95.241(a)(4). Given this authority, it is for the prison officials to decide whether or not the search should be conducted during a prison-wide lockup or whether some less restrictive means is appropriate.

## V.

■ The plaintiffs also contend that the Fourteenth Amendment required the prison officials to afford them certain minimal procedural protection both prior to and during the continuation of the lockup. In resolving this claim, *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1975), requires us to consider three factors: (1) the private interest at stake; (2) the risk of erroneous deprivation involved in the use of challenged procedures and the probable value of additional safeguards; and (3) the Government interest, taking account of the Government function involved and the administrative burdens that additional safeguards would entail. *Id.,* at 335, 96 S.Ct. 893.

Applying these standards to the prison lockup situation, plaintiffs claim to any procedural safeguards is without merit. There is to be sure, a measurable private interest at stake. Prisoners at Graterford had a reasonable expectation that they would have generally free movement within the prison, meals in a dining hall, an exercise period daily and the like. As a result of the lockup their meager lifestyle was significantly cramped. But this interest of the inmate hardly compares to other prisoner rights that have been deemed to require the protection of various procedural devices under the rubric of procedural due process. *E. g., Wolff v. McDonnell, supra* (the prisoners' loss of accumulated good time credits); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole). More importantly, the value of any procedural device is problematical, at best. Plaintiffs suggest that inmates be given an opportunity to object to the initiation of a lockup soon after it is begun and periodically during its continuation. They suggest that inmates could elect delegates to represent their views before a review panel consisting of a correctional officer, an inmate representative and a neutral third party. In the alternative, they suggest that neutral observers be permitted access to the inmates to ascertain and later present inmates' views to the prison officials. As a third device they suggest that counsel be

---

appointed to represent the inmates' views before the prison authorities. Putting aside for the moment the state's interest in not being shackled to rigid formalities in administering general prison policy, it is hard to imagine how any of the suggested alternatives could cause prison administrators to reconsider their decision. If the decision to order a lockup was prompted by a particular situation deemed to be a threat to prison security, it is most doubtful that any showing by inmate representatives could cause a change of heart on the part of prison authorities. And if the lockup is one that is routinely initiated, for example, to conduct systematic cell searches for weapons or other contraband, the value of inmate participation in the decision is nil.

Finally, the state has an overwhelming interest in administering prison policy free of burdensome procedural entanglements. The task of properly operating a maximum security prison is an awesome one. On those occasions when an incident threatens the security of guards and inmates or where a disruption seems imminent, prison authorities must exercise their discretion swiftly and firmly to rectify the situation. And when, as a matter of routine prison policy, a cell search is deemed appropriate, it is for them to decide when to begin the search and how to conduct it, and inmate participation in the decision would be unworkable. Indeed, it could be argued that the key to an effective systematic cell search is unpredictable timing. If prisoners were given advance notice of the search for purposes of contesting it, contraband and weapons would no doubt be secreted outside the cells in many instances.

In sum, the prisoners' liberty interest is so small, the probable value of added safeguards so slight, and the legitimate state interest so overwhelming, that any liberty interest is outweighed entirely by the state need for discretion limited—if at all—only by after the fact adjudication of the substantive decision to order the lockup in the first place.

## VI.

Lastly, we address the plaintiffs' claims with respect to the manner in which the cell searches were conducted. This claim has two aspects: first, it is contended that the cell searches were unreasonable searches and seizures; second, it is claimed that the due process clause of the Fourteenth Amendment requires that the prison officials adopt certain procedural devices to ensure against arbitrary and unreasonable searches and seizures. In gauging the reasonableness of any government search or seizure, we must assess the citizen's reasonable expectation of privacy. *Katz v. United States,* 389 U.S. 347, 356–57, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Lanza v. State of New York,* 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), the Supreme Court intimated that an inmate had no reasonable expectation of privacy in prison. Subsequent developments convince us, however, that prisoners do retain a residue of protected privacy interest that is shielded by the Fourth Amendment. Indeed in *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), in holding that no warrant was required to effect a search and seizure of an incarcerated arrestee some ten hours after the arrest, the Court noted in dicta that

"Holding the Warrant Clause inapplicable to the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct "must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry v. Ohio,* 392 U.S. 1, 20, [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968) . . . We . . . have no occasion to express a view concerning those circumstances surrounding custodial searches incident to incarceration which might "violate the dictates of reason either because of their number or their manner of perpetration. *Charles v. United States,* 278 F.2d 386, 389 (CA9), cert. denied, 364 U.S. 831 [81 S.Ct. 46, 5 L.Ed.2d 59] (1960)." *United States v. Edwards, supra* at 808 n.9, 94 S.Ct. at 1239.

Cases decided subsequent to *Edwards,* convince us that, like First Amendment rights, see *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (freedom of speech); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1971) (per curiam) (freedom of religion), and Fourteenth Amendment rights, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (procedural due process), Fourth Amendment rights are not completely extinguished by confinement in a penal institution.

We need not decide on this record the precise protection afforded by the Fourth Amendment to an inmate in a maximum security institution. It is enough to state that while on the one hand the prison authorities need not have probable cause to conduct a cell search, *Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir. 1975) (Stevens, J.), a prisoner has a reasonable expectation that items of personal property which he legitimately possesses will not be wantonly destroyed or seized by prison guards absent some legitimate state interest in doing so. In this case there is evidence in the record that several items of personal property belonging to the plaintiffs were damaged during the cell searches. For example, various plaintiffs complain that legal papers, televisions, radios, pictures and eyeglasses were seized or damaged during the cell searches. In addition, several plaintiffs testified at their depositions that their cells were ransacked during the search and left in a state of complete disarray. Although prison authorities are free to conduct cell searches when they please and they have much discretion in determining how to conduct the searches, we believe that proof at trial that personal property lawfully possessed by plaintiffs was damaged or destroyed or that their cells were subjected to purposeful and unnecessary disruption, would establish a Fourth Amendment violation.

Plaintiffs also claim that some procedural protections governing the manner of conducting cell searches are required by the Fourteenth Amendment. It is stipulated by the parties that in conducting the systematic cell-to-cell search during the lock-up, prison guards removed the prisoner from his cell, strip searched him, placed him in another cell from which he could not view his own cell and searched his cell for contraband. No written guidelines governed the procedure for cell searches, and no written records were kept which could have served to document the state's claim that contraband had been seized or the inmate's claim that personal property had been misappropriated. We intimate no view at the moment as to whether procedural due process mandates any procedure at all to prevent arbitrary searches and seizures, awaiting instead the plaintiffs' proof at trial of their underlying Fourth Amendment claim. In the event that they do carry their burden, we will consider the question anew in fashioning appropriate injunctive relief. For the foregoing reasons both parties' motions for summary judgment will be denied with respect to the cell search issues.