Byron H. THORNTON, Plaintiff,

v.

Walter W. REDMAN, Paul Keve, George M. Pippin, and Robert Snyder, Defendants.

George E. WHITE, Plaintiff,

v.

Walter REDMAN, George Pippin and Lomount Snyder, Defendants.

Civ. A. Nos. 76–378 and 76–380.

United States District Court, D. Delaware.

Aug. 17, 1977.

Plaintiffs, pro se.

John A. Parkins, Jr., Asst. Atty. Gen., Wilmington, Delaware, for defendants.

STAPLETON, District Judge:

In September 1976, two shakedown searches were carried out at the Delaware Correctional Center (hereinafter referred to as "DCC" or "the Institution"), a maximum security prison at Smyrna, Delaware. In the two suits brought pursuant to 42 U.S.C. § 1983 now before me,[1] inmates seek the return of certain personal property seized from them during the shakedowns. Trials on the disputed issues of fact were held and the matter is now ready for final decision. This Opinion constitutes the Court's findings of fact and conclusions of law on the issues arising under the Fourth, Fifth and Fourteenth Amendments presented by the case.

Walter Redman, Superintendent at DCC, testified that, on September 10, 1976, there was an assault of one inmate by another with a knife. The victim, according to Redman, became highly emotional and attempted to incite others to join the fray. He said that there were "racial overtones"[2] to the incident and that, as a result, tensions rose in the prison. In addition, there were rumors circulating that there was a gun or guns in medium security. Because of the heightened tension and the gun rumor, Redman ordered a general shakedown of the medium security building.

---

1. Plaintiffs White and Thornton filed separate complaints and the cases were tried separately. In large measure, the testimony was identical and the legal issues in the two cases are the same. I have decided, therefore, to treat them in a single Opinion which will be filed in both cases.

2. Thornton testified that he witnessed the incident to which Redman referred and that it was not the highly charged racial incident Redman described. Thornton's testimony did not convince me that the Superintendent's judgment that a shakedown was necessary was erroneous.

For twelve hours on the night of September 10–11, a contingent of seventy guards conducted a search for weapons, drugs and all other contraband. The search operated on a unit-by-unit basis. Guards would enter an area and order it cleared. As each inmate left his cell or dormitory, he was strip searched. He was then sent to the dining room to eat while his area was searched.

Prison guards, who as part of their routine training receive some instruction in methods of conducting a shakedown, executed the searches under the supervision of Assistant Superintendent George Pippin and Captain Robert Snyder. Neither Pippin nor Snyder personally searched through inmates' property. The same is true of Redman. Paul Keve, who Mr. Thornton named as a defendant, was Commissioner of Adult Corrections at the time in question. He did not participate in either the planning or execution of the September 10–11 search. Whether he had a hand in the second shakedown is unclear.

There was little testimony about the second search since it appeared that the plaintiffs' complaints derived primarily from the first shakedown.[3] The scant evidence of record about this second search shows that it followed the same general pattern, although in the second instance more than one hundred officers, including some State Police with trained dogs, assisted in the search.

■ Pippin and Snyder instructed the officers who conducted the searches that they were to carry out a major shakedown of the medium security building and grounds. In addition to inmates' living quarters, they were told to search windows, light fixtures, plumbing, day rooms, the barber shop and social workers' offices. Pippin directed that the primary focus of the search was for anything that might be used as a weapon. He also ordered seizure of any property inmates were forbidden to have. This included unauthorized clothing, obscene photographs, glass containers,[4] extra institutional property such as bedding, duplicates of appliances such as radios, anything listed as contraband in the Inmate's Reference Manual, anything that had been posted as contraband in memoranda periodically circulated, and anything that might be used in an escape attempt. Officers were further instructed that if they were in doubt about whether an item was permitted, they were to seize it.

To permit return or other appropriate disposition of items erroneously seized, items seized for the purpose of a later search for hidden contraband, and items prohibited to inmates which were to be dispatched to relatives or held by the prison, officers were told to put a strip of masking taping on each item seized labelling it with the name of the inmate from whom it was taken, or, if that was unknown, the location where it was found. All seized property was taken to the Assistant Superintendent's office to be inventoried.

Warden Redman testified that among the things officers seized during the shakedown were a gun, thirty knives, both hand-fashioned and store bought, a variety of other hand-fashioned weapons, crockpots, bongo drums, drugs, radios (primarily ones that had been tampered with), rugs and extension cords. The rugs and extension cords apparently were seized because they had been banned in earlier years and many officers were not aware of the rule changes allowing inmates to have them.

**3.** Mr. Thornton's testimony as to what was taken during the first search and what was taken during the second search was confused and conflicting.

**4.** On August 30, 1976 Redman issued an order declaring glass containers contraband effective September 13. On September 10, officers were instructed to seize glass containers, thereby moving up without notice the date by which inmates were required to dispose of such objects. When security requires, prison administrators are entitled to establish new classes of contraband without notice provided inmates are afforded some means by which they can dispose of the things, such as by sending them home through a visitor. *Laaman v. Helgemoe,* 437 F.Supp. 269 (D.N.H.1976).

Corrections officers have general instructions that when they shake down an area they should leave it in as close to the condition they find it as feasible. Pippin testified, however, that it is not routine to replace things as they were, particularly in building-wide shakedowns. All bottles and boxes are opened and checked for their contents. Beds and bedding are thoroughly checked. In some cases, mattresses are slit. None of these things are returned to their original condition. I accept the plaintiffs' testimony that inmate living quarters were left in complete disarray.

When the shakedown was over, Assistant Superintendent Pippin made an inventory of the property that had been confiscated and of the inmates to whom it belonged. By a memorandum dated September 14, Superintendent Redman directed inmates who believed officers had seized property the inmates were allowed to have to submit a written description with a request for its return. More than one hundred inmates contacted Pippin and he returned rugs, watches, radios, trash cans and numerous other items. Inmates were also permitted to make arrangements to send home items prohibited to them by institution rules and regulations.

## PLAINTIFF WHITE'S CLAIMS

White was living in a dormitory in the medium security building. He complains that a radio, a watch and a gold diamond ring were taken from him during the shakedown of September 10–11. He wrote to Superintendent Redman and Assistant Superintendent Pippin requesting that the three things be returned. He received no response. In addition, he complains that he was not permitted to be present during the shakedown of his area.

Pippin testified that he has no record that items of the description were taken from White. He further testified that he reviewed both the labelled and unlabelled property that remains in his custody from the shakedown and that White's things were not among them. Administration officials do concede that property slips for White show that he received a radio that fits the description he has given. They say that they have no record that he had a ring or a watch. White explained that when he originally arrived at DCC the institution kept the ring for safekeeping. DCC property records support that. He also explained that when he was transferred to Sussex Correctional Institution the ring was returned to him and that he has been permitted to keep it since that time, both at Sussex and at DCC. Property records do not reflect that White has ever had a watch. However, White testified that he purchased the watch from another inmate for four cartons of cigarettes.[5]

## PLAINTIFF THORNTON'S CLAIMS

Thornton lived in a single occupant cell in A Block of medium security in September 1976. On the night of September 10, Captain Snyder came to his cell and told him to come out. After a strip search, he went to the dining room. A similar procedure was followed in the second search and he asserts that during the course of the two searches his wedding ring, a book of stamps, two rugs, an extension cord and a bowl purchased in the commissary were taken.[6] In addition, soap powder, bleach and unspecified other property was spilled and strewn about the cell. The cell was in a shambles. He complains both about the property that was taken and about the way in which the search was carried out.

5. Bartering among inmates is a "minor infraction" of prison rules. Inmate Reference Manual, at 12. Redman testified that inmates are supposed to be permitted to have watches that are worth no more than $30 and rings only if they are wedding rings. He acknowledged that these rules are difficult to enforce and frequently broken.

6. In his statement of claims, plaintiff alleged that other items were taken, including cigarettes, family pictures, papers, clothing and a watch. He did not mention these at trial and I assume, therefore, that he no longer wishes to pursue his claims with respect to those items.

The defendants respond that they do not know anything at all about Mr. Thornton's property and that they did not take it. They dispute his claim that he complied with the procedure for reclaiming property and say further that none of it is among the unclaimed property that remains.

■ The constitutional provisions implicated in the plaintiffs' claims are the Fourth and Fifth Amendments as applied to state officials through the Fourteenth Amendment. There is a well established body of case law recognizing that the Due Process Clause affords inmates protection against the unjustified misappropriation of personal property by prison officials. *Kimbrough v. O'Neil*, 545 F.2d 1059 (7th Cir. 1976); *Carroll v. Sielaff*, 514 F.2d 415 (7th Cir. 1975); *Carter v. Estelle*, 519 F.2d 1136 (5th Cir. 1975); *Hansen v. May*, 502 F.2d 728 (9th Cir. 1974); *Russell v. Bodner*, 489 F.2d 280 (3rd Cir. 1973); *Cruz v. Cardwell*, 486 F.2d 550 (8th Cir. 1973); *United States ex rel. Wolfish v. United States*, 428 F.Supp. 333 (S.D.N.Y.1977) (hereinafter "*Wolfish*").

■ There is also an emerging body of case law acknowledging that prisoners have at least minimal rights under the Fourth Amendment prohibition against unreasonable searches and seizures. *Bonner . v. Coughlin*, 517 F.2d 1311 (7th Cir. 1975) (per Stevens, J.), *modified in part on other grounds*, 545 F.2d 565 (7th .Cir. 1976); *Laaman v. Helgemoe*, 437 F.Supp. 269 (D.N. H.1976); *Giampetruzzi v. Malcolm*, 406 F.Supp. 836 (S.D.N.Y.1975); *People v. Gibson*, 1 Prison L.Rptr. 254 (Cal.Super.Ct. 1972). *Contra United States v. Hitchcock*, 467 F.2d 1107 (9th Cir. 1972). *See also Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962) (dicta suggesting that an inmate has no reasonable expectation of privacy in jail).

■ Without attempting to define the outer reaches of those rights in a prison context, this Court accepts the principle that the Fourth and Fifth Amendments protect the rights of inmates in their personal property. Regardless of whether reliance is on the Fourth or Fifth Amendment, the standard would appear to be the same: the Constitution protects a prisoner from arbitrary seizure of or interference with items of personal property by state officials acting under color of law. *Compare Laaman v. Helgemoe, supra, with Wolfish, supra.*

■ There was some conflict in the testimony as to whether White and Thornton did in fact lose the things they claimed as a result of the shakedowns. Although I am not altogether convinced that each of the items they identify was actually taken during the searches, I do accept the claim that some property was taken.[7] However, plaintiffs have not convinced me that any of the defendants had a direct role in the seizure of plaintiffs' or any other property.

The testimony placed only Captain Snyder at the scene of the searches at the relevant times and he was acting in a supervisory role. He did not actually participate in the search of White's dormitory or Thornton's cell. Redman, Pippin and Keve were not present during the shakedown of the two areas. Since none of the four searched either of the areas, they were not in a position to misappropriate any of the property in question. They cannot be held liable on that aspect of the plaintiffs' claims.

■ Redman, Pippin and Snyder did play an active role in planning and directing the shakedowns. If the procedures they established do not pass constitutional muster, they can be held liable to the plaintiffs.[8] The Court is satisfied, however, that given the particular circumstances of the shakedowns, the procedures the defendants adopted were reasonable and the shake-

7. In general, I found Mr. White's testimony on this point credible. Mr. Thornton was somewhat confused on certain particulars and, for that reason, I have greater doubt about some of his claims.

8. Since I conclude there was no violation of plaintiffs' constitutional rights by these defendants, I do not reach the issue of whether they are entitled to official immunity.

downs were carried out in a reasonable manner.

■ There are a wide range of factors to consider in assessing the reasonableness of shakedown procedures. Included among them are the nature of the institution, the reason for and the scope of the search, the instructions and supervision given to those who carry out the search, the means provided for the return of any mistakenly seized property.

■ Here, the Superintendent was dealing with a sensitive situation in a large unit of a maximum security institution. There was rumored to be one or more guns hidden in the unit, a rumor which proved to be justified. On a record such as this, the Court will not question the determination that an expeditious and building wide shakedown was necessary. Once that is granted, it must be recognized that the disruption to inmates had to be substantial and that there was little that could be done to minimize the intrusion if the shakedown was to be carried out as thoroughly and expeditiously as prison officials believed the situation demanded.

Pippin and Snyder did instruct officers about what they should seize and the testimony persuades me that there was not major confusion on that count. Rugs and extension cords appear to be the two things about which there was confusion and that was traceable to a rule change. Superior officers circulated through the areas being searched to answer questions and to see that instructions were carried out properly.

Lastly, the institution did make provision for the return of erroneously seized goods. The inventory list Pippin prepared reflects that one hundred and twenty inmates submitted requests for the return of their property pursuant to the established mechanism and the Institution had to inform only nineteen that their property was unavailable.

■ Obviously, no procedures the defendants might have employed would have provided an absolute guarantee against excesses and illegal acts such as pilfering by subordinates.[9] But the Constitution does not require that of them. Undoubtedly much more was taken, lost or damaged during the shakedowns than the Court heard about and that is unfortunate. However, in the absence of a showing that the scope and manner of the search was unjustified—and the record suggests the contrary—the Court concludes that the shakedown procedures did not violate the plaintiffs' constitutional rights.

A final comment is in order. There has been some suggestion in recent case law that for shakedowns to satisfy constitutional standards a system for providing receipts and for allowing an inmate to be present while his cell is searched might be required. *Wolfish, supra; Giampetruzzi v. Malcolm, supra.* These procedures are clearly desirable, and, depending on the totality of circumstances, may be constitutionally required in some shakedown situations. However, courts have not explicitly addressed the application of such rules in the context of a massive general shakedown such as the one involved here. As noted, the searches encompassed large areas of the prison. The first search, which involved seventy correctional officers, lasted twelve hours; the second, with more than one hundred officers, took six hours. Unquestionably, they would have been prolonged substantially and, in the Court's judgment, unreasonably if the officers had been required to stop and prepare receipts for each item seized. In addition to imposing a much greater burden on the Institution, inmates would have been subject to an even greater disruption in their routine.

Several inmates testified that, ordinarily, during the shakedown of a single cell or a small area, the inmates are allowed to witness the search. Prison officials justified the deviation from that practice on the grounds that the presence of the inmates would have hampered the thoroughness of

---

9. Pippin testified that he investigated whether there had been pilfering by the officers who carried out the search but that he found no evidence of it.

the shakedown and might have touched off further incidents of violence. On the present record, this Court is not prepared to declare that such a judgment was unreasonable and violated the Constitution.

In sum then, the plaintiffs have not shown that their constitutional rights were violated by any of the named defendants.