**Auther STRINGER, Plaintiff,**

**v.**

**James R. THOMPSON, et al.,
Defendants.**

**No. 79 C 1743.**

United States District Court,
N. D. Illinois, E. D.

March 3, 1982.

Darryl DePriest, Jenner & Block, Chicago, Ill., for plaintiff.

Theresa M. McGrew, Asst. Atty. Gen., State of Ill., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Auther Stringer ("Stringer"), an inmate of Stateville Correctional Center ("Stateville"), sues a number of state and correctional officials under 42 U.S.C. § 1983 ("Section 1983") claiming violations of Stringer's Fourth, Sixth, Eighth and Fourteenth Amendment constitutional rights.[1] Stringer's action arises out of the institution and aftermath of a "lockdown" at Stateville in the early months of 1979. Defendants have moved under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss the Complaint's six counts for failure to state a cause of action. For the reasons contained in this memorandum opinion and order, the motion of Governor James Thompson ("Thompson") is granted and all other defendants' motions are denied.

### Facts[2]

About February 23, 1979 Stateville Warden Lou Brewer ("Brewer") asked permission of Thompson and Director of the Illinois Department of Corrections ("Department") Gayle Franzen ("Franzen") to declare a state of emergency at Stateville. With permission granted a lockdown ensued, followed by a search of all residents and areas of Stateville beginning February 24.

On February 23 Franzen, his Assistant Director Michael Lane ("Lane") and Brewer circulated a memorandum to all Stateville inmates telling them of the lockdown. It also told the inmates where they would be relocated during the lockdown and what property they would be allowed to take with them to the temporary locations.

Before the lockdown Stringer lived in cell 128, Cellhouse C. About March 9 he was temporarily relocated to cell 422, Cellhouse B–East. During the relocation a pair of trousers (an article of clothing listed in the

---

1. All Stringer's rights are of course derived from the Fourteenth Amendment. To the extent that the First Amended Complaint (the "Complaint") invokes provisions of the Bill of Rights read into the Fourteenth Amendment, this opinion will follow customary usage and refer directly to the Bill of Rights numbering.

2. As always, the well-pleaded allegations of the Complaint are taken as true on this Rule 12(b)(6) motion. No findings of fact are made or implied.

memorandum as an approved item of personal property) and a pair of shoes (not so listed) were seized from Stringer by correctional officers. They have not been returned since.

Stringer remained in B–East for about four days, after which he was returned to cell 128. On his return he discovered a large amount of personal property was missing from his cell, including legal papers belonging to Stringer and other legal papers entrusted to him by other inmates.[3] Except for Stringer's typewriter the missing items have not been returned.

Complaint Counts I through IV are grounded on those facts. Counts V and VI arise out of Stringer's placement in investigative segregation shortly after his return to Cellhouse C:

Stringer was first moved to cell 305, Cellhouse E. Then about March 28 he was moved again, to cell 342, Cellhouse B–West. At the same time prison officials placed Stringer under investigative segregation until April 18, when he was returned to Cellhouse C.

Cell 342, Cellhouse B–West, where Stringer was confined while under investigative segregation, had a broken window, subjecting Stringer to a draft. Additionally its walls were smeared with human waste, which Stringer was forced to clean himself. As a result of his placement in cell 342 Stringer suffered a seizure on April 7 (*during* the confinement), and he had to be taken from the cell to receive medical treatment.

### Counts I–IV
#### Count I

Complaint Count I alleges the March 9 seizure of Stringer's trousers and shoes violated his due process rights. Counts II and III are directed to the taking of Stringer's personal property from his cell while he was housed temporarily in Cellhouse B–East between March 9 and 13 (Count II charges a

violation of Stringer's Fourth Amendment right to be free from unreasonable searches and seizures, while Count III claims a violation of the Due Process Clause). Count IV asserts that seizure of the legal documents regarding Stringer's lawsuits against Department officials infringed his Sixth Amendment right of access to the federal courts.

■ Count I readily withstands defendants' motion to dismiss. *Kimbrough v. O'Neil*, 545 F.2d 1059, 1061 (7th Cir. 1976) (en banc) held "a taking with intent (or reckless disregard) of a claimant's property by a State agent violates the Due Process Clause of the Fourteenth Amendment and is actionable under Section 1983...." *Kimbrough* too was a prisoner, and that status can of course make no difference to the result here. "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).

Stringer's allegations bring him within *Kimbrough*: Stateville officials took his property (the trousers and shoes) and the taking was intentional. Nothing else is required to withstand a motion to dismiss. While defendants may prove *reasons* for the taking that could establish a valid defense, that possibility cannot support a motion to dismiss. All the Complaint need state is a set of facts upon which Stringer could recover. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). If defendants could not prove a legally sufficient justification at all for their conduct, Stringer could certainly recover.

#### Count II

■ Count II is sanctioned by *Bonner v. Coughlin*, 517 F.2d 1311 (7th Cir. 1975), modified on other grounds, 545 F.2d 565 (7th Cir. 1976) (en banc). *Bonner* held (517 F.2d at 1317) "a prisoner enjoys the protec-

---

3. Other missing items comprised a typewriter, two small booklets of Stringer's poems, a combination tape player and radio, documents pertaining to a non-profit corporation set up by Stringer, photographs and personal hygiene items and envelopes containing poems, other writings and some correspondence as to prisoners' rights.

tion of the Fourth Amendment against unreasonable searches, at least to some minimal extent."

It is true that the level of Fourth Amendment protection enjoyed by prisoners does not rise to that possessed by unincarcerated members of society. *Ibid.* Indeed, the *Bonner* Court held that a search of a prisoner's cell was *not* impermissible under the Fourth Amendment simply because the search was unsupported by probable cause, a warrant or the prisoner's consent.[4]

But Count II's Fourth Amendment claim stands in a position much like Count I's due process claim.[5] Defendants rely on *Thornton v. Redman*, 435 F.Supp. 876, 881 (D.Del. 1977) in arguing that the reasonableness of the shakedown procedures must lead to Count II's dismissal. Again defendants choose to forget the Complaint defines the factual universe for present purposes. It charges a search and seizure of property neither contraband nor otherwise illegal. Seizures are not necessarily reasonable *per se* under the Fourth Amendment simply because the search was undertaken pursuant to *some* prison procedure, although *Bonner* explicitly left that question open. *Bonner*, 517 F.2d at 1317; *cf. Thornton*, 435 F.Supp. at 880.

Stringer may not ultimately prevail on the merits of his Fourth Amendment claim. It might only be necessary for defendants to articulate a minimal rational justification for the search of Stringer's cell and the taking of his property, *i.e.*, some justification demonstrating that the search and seizure were not arbitrary. But at this stage a *cause of action* has been stated.

4. Such a search of an individual's private home would, of course, be impermissible.

5. Defendants contend the Complaint is vague—that it only states when Stringer returned to his cell he found some of his personal property missing, and that "he leaves it for the Court to assume that the defendants were responsible for the loss." Not so. Paragraph 24 sufficiently states the correctional officers conducting the shakedown took the property. Defendants are alleged to be responsible through their failures (a) properly to instruct correctional officers as to what items could be seized as contraband, (b) properly to inform inmates before the shakedown as to what items of personal prop-

This opinion need not decide the ultimate standard Stringer must meet to prevail on Fourth Amendment grounds. For purposes of defendants' motion the only "justification" for the search was that it was undertaken pursuant to orders from those authorized to make such decisions: the Governor and the Director. If *Bonner* is to have any real meaning,[6] that "justification" cannot make the search and consequent seizure conclusively valid under the Fourth Amendment.

*Count III*

 Defendants failed to observe and enforce Department's Administrative Regulation ("A.R.") 401(II)(A) and (B) in the search and seizure:

A. All contraband (unauthorized material) discovered during a search is to be confiscated, recorded on Form T–231 (See Attachment A to this regulation) and reported to a supervisory officer.

B. Although it is essential that all searches be thorough and systematic, it is equally important that no damage, loss or abuse occurs to any personal property. Any such damages, loss or abuse may result in disciplinary action against the offending employee.

Those provisions were breached in the following respects: '

1. Any contraband discovered during the search was not recorded on Form T–231, nor was that Form given to Stringer within 24 hours of the shakedown of the cell (A.R. 401(II)(A)).

erty were subject to seizure, (c) to promulgate guidelines for the amount of authorized personal property that may be retained in inmates' cells and (d) to observe Administrative Regulation 401, discussed below in connection with Count III.

6. In another prisoner case this Court had occasion to recall the language of Shakespeare's *Macbeth* (Act V, Scene 7, lines 50–51): to "keep the word of promise to our ear and break it to our hope." As in *Shango v. Jurich*, 521 F.Supp. 1196, 1202–03 (N.D.Ill.1981), constitutional guarantees are meaningful only if they are given more than lip service.

2. Non-contraband was not returned to Stringer (A.R. 401(II)(B) prohibits "damage, loss or abuse" of an inmate's personal property).

Count III poses the question whether A.R. 401 confers an entitlement in due process terms, so that a State's violation of the regulations is cognizable under Section 1983. This Court has answered that question affirmatively as to other A.R.s. *Shango v. Jurich*, 521 F.Supp. 1196, 1202 (N.D.Ill. 1981); *Harris v. McDonald*, 532 F.Supp. 36 (N.D.Ill.1982). But it has also recognized that violation of minor procedural rules in the regulations would *not* implicate due process. *See United States ex rel. Houston v. Warden, Stateville Correctional Center*, 635 F.2d 656, 658–59 (7th Cir. 1980).

A.R. 401(II)(A) and (B) are hardly minor. Nor is the prisoner's interest to which those regulations speak. It is unnecessary to decide whether the Constitution requires the State to identify what it confiscates from a prisoner's cell during a generalized shakedown.[7] Here the State has undertaken to do so and has also promised not to damage, lose or abuse noncontraband seized in the course of such a search. Underlying those undertakings is an accurate perception of the importance our system places upon our private property—prisoners' as well as free men's—vis-a-vis the state.

In sum A.R. 401(II)(A) and (B) sufficiently create an expectation in a property interest so that its violation infringes the Due Process Clause. Count III too withstands defendants' motion to dismiss.

*Count IV*

■ Count IV like Count II is controlled by *Bonner*, 517 F.2d at 1320:

Bonner also contends that the loss of his transcript interfered with his right of access to the Illinois courts. It is clear that defendants owed him a constitutional duty not to abridge such access. It follows that they may well have owed him a

higher degree of care to avoid the loss of his trial transcript than the duty they owed to him with respect to other items of personal property. We may assume, ... that an intentional taking of a prisoner's legal materials that results in an interference with his access to the courts violates this duty. Thus, with respect to the seizure of his transcript by the prison guards, Bonner has stated, assuming his ability to demonstrate such an interference, a ... cause of action....

Confiscation of Stringer's legal papers relevant to his lawsuits against state officials brings him squarely within *Bonner*. Count IV therefore states a cause of action under the Sixth Amendment.

*Counts V and VI*

Stringer's final two counts require little discussion:

Count V alleges a deprivation of Stringer's due process rights based upon the State's violation of A.R. 804(J). Brewer and his then Administrative Assistant George May placed Stringer in investigative segregation for 20 days without a hearing or the filing of a disciplinary report. D.Br. 5–6 does not quarrel with Count V's substantive validity, but contends instead that Stringer "does not allege that defendants Brewer and May placed him in investigative segregation, or that they authorized the placement, or that they knew about it." However those defendants are presumed to have had responsibility for Stringer's deprivation (see the discussion in the next section of this opinion).

■ Count VI asserts an Eighth Amendment claim. Defendants respond that an Eighth Amendment violation may be established only by intentionally-inflicted excessive or grossly severe punishment or by knowing maintenance of conditions so harsh as to shock the general conscience. *LaBatt v. Twomey*, 513 F.2d 641, 648 (7th Cir. 1975).

The basic principles of due process which require the institution to account for such property are so well established that we need not dwell long in affirming this aspect of Judge Frankel's order.

7. *See Wolfish v. Levi*, 573 F.2d 118, 131–32 n.29 (2d Cir. 1978), reversed on other grounds sub. nom. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979):

More recently, however, our Court of Appeals said in *Little v. Walker*, 552 F.2d 193, 197–98 (7th Cir. 1977), that "deliberate deprivation" of Eighth Amendment rights could be established by a showing of either intent or recklessness on defendants' part. *Little* teaches (*id.* at n.8) that recklessness under Section 1983 is an "objective" determination, involving "such disregard of the [plaintiff's] clearly established constitutional rights that [the] action cannot be reasonably characterized as being in good faith." On the Complaint's allegations a jury could find the "harsh conditions" required by *LaBatt* and the "recklessness" required by *Walker*. To survive a motion to dismiss the Complaint need do more. Defendants' motion to dismiss Count VI must also fail.

### Defendants' Personal Involvement

Defendants also argue that all Counts of the Complaint must be dismissed because they run afoul of Rule 8(a)(2)'s requirement that they contain "a short plain statement of the claim showing that the pleader is entitled to relief." Defendants cite *Adams v. Pate*, 445 F.2d 105, 108 (7th Cir. 1971) for the proposition that Section 1983 liability must rest on direct responsibility for the claimed deprivations of a constitutional right. Such responsibility, they say, is not established by the Complaint's allegations.

■ That contention simply misreads the Complaint. It charges direct, not derivative, misconduct by defendants. It does *not* rest on the impermissible respondeat superior notions held insufficient in such cases as *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

But if that short answer were not enough (as it clearly is), Stringer's Complaint would still survive under the teaching of *Duncan v. Duckworth*, 644 F.2d 653 (7th Cir. 1981). True enough *Duncan* (*id.* at 655) relied on the "well established requirement that *pro se* pleadings be held to less stringent stan-

dards than those prepared by counsel," and Stringer now has the benefit of able appointed counsel.[8] But Stringer's initial Complaint *was* filed *pro se*, and Stringer then either did not know or could not recall the names of the directly responsible correctional officers. Appointment of counsel could not help Stringer's knowledge or memory.

For that reason the worst reading of the Complaint is Stringer (and now his counsel) have done what *Duncan* approved: naming as defendants prison officials who, due to their position, justify the inference that they bear direct responsibility for the alleged misconduct.[9] Illegal search of Stringer's cell, taking of his property, violation of A.R.s and confinement in investigative segregation—all those events are the sort for which defendant prison officials (Brewer, May, Stateville's Program Coordinator Patterson and its Personal Property Officer Maxwell) are typically responsible. It is entirely reasonable for the Complaint to assert their Section 1983 responsibility for the sort of civil rights violations alleged. If they need not respond in damages for such deprivations, Section 1983 would be eviscerated as a vehicle for enforcement of prisoners' civil rights.

Defendants Franzen and Lane were Director and Assistant Director of the Department at the time of the Stateville lockdown. Department officials admittedly stand in a more distant relation to the violations than the prison officials, who were on the scene throughout the lockdown period and its aftermath. Nonetheless Franzen and Lane were the leading correctional officials during a period of a massive lockdown and full-scale investigation at one of the state's largest maximum-security prisons. Under the Complaint's allegations a prima facie case is stated for their responsibility for the constitutional deprivations by their administrative subordinates at Stateville. What Judge Fairchild wrote in *Duncan* (644 F.2d at 656) applies here as well:

> complaint in *Duncan*. It alleges action and inaction by defendants as a specific source of their direct responsibility.

8. Darryl DePriest, Esq., of Jenner & Block.

9. Again it should be stressed that the Complaint does not rely on inferences, as did the

To be sure, our conclusion in both this case and *Chavis* does represent somewhat of a departure from a strict application of *Adams v. Pate, supra.* But it is a departure which we believe is justified by the nature of the claims presented. Both cases involve claims relating to conditions or practices which, if they in fact do exist, would very likely be known to, or acquiesced in, by officials at a relatively high administrative level.

*See also Chavis v. Rowe*, 643 F.2d 1281, 1290 (7th Cir. 1981); *Maclin v. Paulson*, 627 F.2d 83, 87 (7th Cir. 1980). Again unlike *Duncan*, the Complaint here relies on allegations—not inferences in the absence of allegations.

■ Thompson however stands in a different posture. As Illinois Governor he exercised "executive authority" over the Department and Stateville. But as was true of the warden in *Duncan*, Thompson would not likely have been so directly involved in the running of the state prison system that. he would have personally participated in, or had knowledge of, the kinds of decisions that led to the violations of Stringer's civil rights. Stringer complains of actions taken during the lockdown by prison guards (search and seizures) and by prison officers (placement in segregation). It is not unlikely that decisions by correctional officials at any level would have led to such violations.

But Thompson is alleged to have done no more than authorize the lockdown. There is no claim or reason to believe he had any participation in decisions made by prison officials or guards as to the methods by which the lockdown and its aftermath were conducted. Those methods caused Stringer's injuries. *Duncan* mandates Thompson's dismissal from this action.

### Conclusion

This action is dismissed as to defendant Thompson. All other defendants' motions to dismiss are denied, and they are ordered to answer the Complaint on or before March 15, 1982.