**Charles ALLMAN, et al., Plaintiffs,**

v.

**Thomas A. COUGHLIN III, et al., Defendants and Third-Party Plaintiffs,**

v.

**Alfred DELBELLO, et al., Third-Party Defendants.**

**No. 82 Civ. 1149 (GLG).**

United States District Court, S.D. New York.

Jan. 10, 1984.

New York Civil Liberties Union, New York City, for plaintiffs; Richard Emery, Jonathan Pines, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants and third-party plaintiffs; Richard Howard, Tarquin Bromley, Ellen Weisburd, Asst. Attys. Gen., New York City, of counsel.

Stephens & Buderwitz, White Plains, N.Y., for third-party defendants; Joseph M. Buderwitz, Jr., White Plains, N.Y., of counsel.

## AMENDED MEMORANDUM DECISION [1]

GOETTEL, District Judge.

The claims of Fourth and Fourteenth Amendment violations, brought in this action pursuant to 42 U.S.C. §§ 1983 and 1985 (1976), arise out of events that occurred at the Westchester County Jail (the "Jail") on July 12 and 13, 1981 (the "relevant period"), when New York State's Correctional Emergency Response Team (the "CERT") regained control of the Jail following a three-day takeover by its inmates. The named plaintiffs, who were confined in the Jail during the events in question, now move pursuant to Fed.R.Civ.P. 23 for certification of the class of all male inmates incarcerated in the Jail during the relevant period. The defendants, who are state officials charged by the plaintiffs with responsibility for the deployment of the CERT,[2] not only oppose class certification but also make two cross-motions: one seeking dismissal of a number of the plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(6), and the other requesting that the Court abstain from considering any of their claims on the

ground that they should be heard in state, rather than federal, court.[3] For reasons discussed below, the Court grants the plaintiffs' motion for class certification and denies both of the defendants' cross-motions.

### I. Background

The alleged facts upon which the plaintiffs' complaint is based can be summarized briefly. On Friday, July 10, 1981, an inmate disturbance at the Jail resulted in the evacuation of its correction officers. Shortly thereafter, negotiations began between inmates and Westchester County officials. By Sunday, July 12, the county officials, frustrated with the pace of the negotiations, requested defendant Thomas Coughlin, Commissioner of the New York State Department of Correctional Services, to send the CERT to the Jail to search and secure the facility.

Before the CERT arrived, however, county and inmate negotiators were able to reach an agreement on how control of the facility could be returned to the county officials. Inmates were to return to their cells voluntarily, put all contraband in the corridors for confiscation by correction officers, and submit to reasonable procedures incident to a search for contraband. In return, the county officials promised, among other things, that inmates would not be subjected to physical reprisals during or after the retaking of the facility.

Despite this agreement, the county officials apparently continued to feel a need for assistance and, therefore, asked that the CERT be deployed to resecure the Jail. The wisdom of that decision is challenged by the plaintiffs. They claim that, though the inmates offered little or no resistance to the CERT, its line officers systematically engaged in activities designed to injure the

1. This memorandum decision, which supercedes and replaces that which was filed by the Court on June 10, 1983, is substantively identical to the original decision, containing grammatical and stylistic changes only.

2. Originally, both county and state officials were defendants in this action. For reasons not relevant here, the plaintiffs later dropped their claims against the county officials while continuing to sue those state officials who were considered responsible for the selection, training, and supervision of the CERT. Shortly thereafter, the state defendants impleaded the county officials as third-party defendants.

3. The third-party defendants join the defendants in opposing certification of the class but express no opinion as to the defendants' cross-motions.

inmates physically and psychologically and to seize their property in a manner that virtually precluded its later return. More specifically, it has been alleged, and the plaintiffs have offered evidence to suggest, that at least some of the CERT line officers engaged in such activities as: (1) forcibly stripping inmates; (2) handcuffing their hands so tightly that circulation was cut off and excessive pain caused; (3) running the inmates barefooted over glass-strewn floors; (4) kicking, pushing, tripping, beating and spitting on inmates; (5) running some of them into stone walls; (6) forcing them to stand naked in the courtyard of the Jail for as long as five hours; (7) taunting and abusing them verbally while they stood naked and handcuffed in the courtyard; and (8) emptying the contents of their cells into large piles, which were later stuffed into garbage bags, so that particular items could not subsequently be identified as belonging to particular prisoners.

## II. *Discussion*

These activities, claim the plaintiffs, constituted violations of their Fourth Amendment right to be spared unreasonable searches and seizures and their Fourteenth Amendment right not to be deprived of liberty or property without due process of law, as well as violations of 42 U.S.C. §§ 1983 and 1985. The plaintiffs further contend that because virtually all of the inmates were subjected to what is alleged to have been a systematic and indiscriminate violation of their rights, they should all be included in a class, with the named plaintiffs to serve as their class representatives. In addition, the plaintiffs ask the Court to divide the class members into two subclasses, one to include the sixty or so male inmates who were confined in that section of the Jail known as the Women's Annex and the other to include the approximately 200 male inmates who were confined in the main section of the Jail.[4] Both parties apparently agree that the two groups of inmates were treated sufficiently

differently that, if the class is to be certified, the creation of two subclasses is merited.

### A. *Certification of the Class*

Before the requested class can be certified, this Court must assure itself that the requirements of Rule 23(a) and (b) have been met. In the first place, a class action can be permitted:

> only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In the second place, it is further required in a class action of the type requested here that:

> the court find[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). The plaintiffs contend that all of these requirements are met in the instant case.

■ The defendants respond, however, that several of the Rule 23 requirements are not satisfied.[5] The first one said to be lacking is the predominance of common

---

4. Although there were a few female inmates confined in the Jail during the relevant period, they were not involved in the events that form the basis of this action.

5. Satisfaction of the remaining requirements is not in question here. There is no suggestion, for example, that the numerosity requirement is not met or that counsel for the plaintiffs, the

issues of fact or law. With regard to the facts, the defendants contend that each inmate was treated individually and that any actions taken against him involved only him and the particular CERT officers who took those actions. With regard to the legal issues, the defendants claim that there is no evidence of a plan, pattern, or practice of constitutional violations by the defendants, but rather, at most, only evidence of a few isolated breakdowns in discipline and sporadic violations of inmates' rights, attributable solely to the few line officers who individually exceeded their authority.

Contrary to the defendants' assertions, however, the Court finds that common issues of both fact and law do predominate. As to the facts, the CERT's actions occurred in a limited period of five or six hours. The plaintiffs' submissions quite clearly suggest the possibility of systematic and indiscriminate violations of the inmates' rights, as well as the possibility of a gross failure on the part of the defendants to properly select, train, and supervise the CERT line officers. The apparently unchallenged fact that the prisoners agreed to hand over the facility peacefully and in large part did so provides additional evidence that the CERT may not have been properly prepared to undertake the resecuring of a facility while meeting with minimal resistance. Undoubtedly then, the predominant issues of fact will be whether the selection, training, and supervision were adequate and whether there was, in fact, a "system" to the abuses that have been alleged, even though there will obviously be some issues of fact pertaining only to individuals and to individual incidents.[6] The fact that the plaintiffs seek damages that are to be divided equally among all class members supports their claim that it is the systematic and indiscriminate nature of the violations that they ultimately seek to prove, not the particular details of each incident.

Similarly, the issue of law which predominates here is one that is common to all of the inmates, namely: did whatever failures in selection, training, and supervision that may have occurred constitute, in and of themselves, violations of the inmates' constitutional rights because those failures led directly to the injuries and deprivations that are alleged? Clearly this is the critical and primary question that the plaintiffs seek to have this Court answer, and it is one that is common to each inmate present during the relevant period.

 The second prerequisite that the defendants find lacking is an absence of other litigation arising out of the events in question. Although several separate, federal actions arising from the events in question have already been commenced in this Court, the focus of the defendants' concerns appears to be approximately 100 notices of intention to file state claims, which notices were filed more than a year ago in New York's Court of Claims. The defendants' concern, however, is simply not merited. As the plaintiffs have pointed out, by filing such notices of intention, pursuant to sections nine and ten of New York's Court of Claims Act,[7] the inmates have not com-

---

New York Civil Liberties Union, will not be able to provide the class with adequate legal representation.

**6.** The cases upon which the defendants rely to argue an insufficiency of common factual and legal questions concern situations not even remotely similar to that in the instant case. For example, in *McLeod v. Scully and Coughlin,* No. 81 Civ. 3139 (S.D.N.Y.1981), the challenge was to the constitutionality of all lockdowns in all New York State correctional facilities for all times—hardly a case similar to this one, in which claims are made against those in charge of a single team of state correction officers who were acting in concert in a single facility over a brief period of time to achieve a single objec-

tive. *Cf. also M.M. v. Anker,* 477 F.Supp. 837, 844–45 (E.D.N.Y.), *aff'd,* 607 F.2d 588 (2d Cir. 1979).

**7.** Section nine of New York's Court of Claims Act reads in relevant part:

The court shall have jurisdiction: ...

2. To hear and determine a claim of any person ... against the state for the appropriation of any real or personal property or any interest therein ... or for the torts of its officers or employees while acting as such officers or employees, providing the claimant complies with the limitations of this article. N.Y.Ct.Cl. Act § 9(2) (McKinney 1963 & Supp. 1983).

menced state actions, *see, e.g., Jackson v. State,* 85 A.D.2d 818, 818–19, 445 N.Y.S.2d 620, 621 (1981) (court ruled that where only a notice of intention had been filed, no action had been instituted), *appeal denied,* 56 N.Y.2d 568, 435 N.E.2d 402, 450 N.Y. S.2d 185 (1982), but rather preserved their right to do so by effectively extending the limitations period within which they must bring suit. In fact, it appears that only one of these 100 inmates has actually commenced an action. If anything is demonstrated by this almost total lack of resort to the state courts, it is that these mostly indigent inmates appear to be relying primarily, if not solely, on this Court to provide them with whatever judicial remedies they are entitled to.

Furthermore, steps can be taken by this Court to ensure that the dictates of Rule 23 are complied with and that any potential for parallel or conflicting litigation is reduced to an absolute minimum. The class can be restricted to those inmates who indicate that they are not maintaining and will not maintain separate federal or state actions based upon the events that form the basis of this class action. Those who have already instituted such actions can be presumptively excluded from the class unless and until they inform the Court that they wish to be included and simultaneously take steps to withdraw their separate actions. Also, any notice to the inmates can emphasize that any inmate who believes he has suffered extraordinary loss or injury may choose to sue individually (or continue his existing litigation) in order to seek damages that he would be precluded from recovering if he participated in this action. This special notice, at least to some extent, should serve to cull from the potential class members those individuals who

were involved in incidents so unique that they raise highly individualized issues of law or fact.

We conclude, therefore, that the defendants' second objection to certification of the class is simply not persuasive. The present paucity of parallel litigation (involving, as it does, less than five percent of the total potential class), the relatively low probability that additional, separate actions will be commenced in the future, and the availability of the safeguards just described, convince the Court that maintenance of this class action should expedite, not complicate or delay, resolution of the claims that have arisen from the events that transpired on July 12 and 13, 1983.

■ The third and final prerequisite that the defendants believe to be lacking here is the appropriateness of the federal forum, though they have raised this problem as much in their cross-motion for abstention as in their opposition to class certification. Regardless of its setting, their argument that this Court should abstain from exercising its jurisdiction over this matter and defer to state proceedings is simply without merit. As was just noted, of the hundreds of potential state claims that might have been filed only one actually has been. Moreover, the claims in this action are for violations of federal constitutional and statutory rights, not state laws or regulations.[8] Finally and most importantly, as the plaintiffs have pointed out in some detail, this case does not present any of what the Supreme Court, in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814–18, 96 S.Ct. 1236, 1244–46, 47 L.Ed.2d 483 (1976), has held to be legitimate grounds for a federal district

---

Section ten of the same act reads in relevant part:

A claim to recover damages for injuries to property or for personal injury caused by the tort of an officer or employee of the state while acting as such officer or employee, shall be filed within ninety days after the accrual of such claim unless the claimant shall within such time file a written notice of intention to file a claim therefor, in which event the claim shall be filed within two years after the accrual of such claim.

N.Y.Ct.Cl. Act § 10(3) (McKinney 1963).

**8.** Were the defendants correct in implying that state prisoners cannot properly bring federal civil rights claims in federal court, it would be most difficult to explain the more than six-fold increase in the number of such claims filed in the federal courts between 1970 and 1982. *See* 1982 Annual Report of the Director of the Administrative Office of the United States Courts at 103 (number of such claims rose from 2,657 in 1970 to 16,741 in 1982).

court's abstention from the exercise of its jurisdiction.[9] Given, therefore, that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," *id.* at 813, 96 S.Ct. at 1244, we are left with no choice but to exercise that jurisdiction which all parties concede is vested in this Court.

In summary, the Court concludes that none of the defendants' reasons for opposing certification of the class is persuasive. Although perhaps a somewhat unusual case, this is certainly one in which great judicial economy will be achieved by the creation of a class and the division of that class into two subclasses.

Accordingly, the Court certifies the class of all male inmates who were incarcerated at the Westchester County Jail on July 12 and 13, 1981. Any inmate who has already filed a separate action, or who subsequently files such an action, shall be excluded from the class unless he indicates a desire to join the class both by filing a written notice with the Court no later than September 13, 1983, and by simultaneously commencing the withdrawal of his separately filed action. All other inmates shall automatically be included in the class unless they notify the Court by September 13, 1983, that they wish to be excluded.

The above description of the class and of the restrictions that are imposed upon all class members is to be conveyed, as soon as possible, and preferably by July 1, 1983, to all males who were inmates in the Jail during the relevant period. That description shall be included in a notice which shall also contain the following information:

(1) The class seeks money damages for injuries and property losses caused by the CERT during its deployment at the Jail on July 12 and 13, 1981.

(2) The particular damage claims to be presented include:

(a) property loss as a result of seizure or destruction by the CERT;

(b) pain and injuries due to excessively tightened handcuffs;

(c) pain and injuries caused by running barefoot over broken glass;

(d) pain and injuries caused by being struck by CERT officers standing in gauntlets;

(e) verbal harassment by CERT officers;

(f) harassment and assault during forced detention in the Jail's courtyard;

(g) injuries caused by being dragged through the annex tunnel in which CERT officers repeatedly inflicted beatings and verbal harassment.

(3) The class seeks a fixed amount of damages to be divided equally among the inmates who suffered from any of the losses or injuries listed in (2)(a)–(g) above.

(4) Those inmates who believe that the harm inflicted upon them was substantially different from, or more than, that inflicted on most inmates, may choose to "opt out" of this class action in order to pursue remedies that they would be precluded from seeking if they were to remain in the class.

(5) Any judgment or settlement of this class action will be binding upon all those who are included in the class. They will participate in any damages that are awarded to the class or obtained by it through a

---

**9.** In a recent opinion in another case, we summarized the Supreme Court's opinion in *Colorado River* in the following terms:

The Supreme Court has approved the invocation of the abstention doctrine in four types of cases: (1) where a state court's interpretation of an unclear but pertinent state law might moot or put in a different light a federal constitutional question; (2) where a difficult question of state law is presented that involves state policy concerns whose importance transcends the result in the case at bar; (3) where proceeding with a federal action

might interfere with a related state criminal prosecution; and (4) where, in certain exceptional cases, a concurrent state proceeding is pending and a stay or dismissal would achieve wise judicial administration. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814–18, 96 S.Ct. 1236, 1244–46, 47 L.Ed.2d 483 (1976).

*Arnav Industries, Inc. v. Dreskin*, 551 F.Supp. 461, 463 n. 2 (S.D.N.Y.1982). The defendants have not explained, and we do not see, how any of these four branches of the abstention doctrine could be appropriately applied in this case.

settlement. However, they will lose their right to pursue in another lawsuit any claims relating to the retaking of the Jail on July 12 and 13, 1981.

(6) Any person who is a member of this class may, if he so chooses, enter an appearance in this action through his counsel.

(7) Any person who "opts out" of this class action, whether or not he chooses to bring a separate lawsuit, will lose any right he may have had to participate in any damages that are awarded to the class or obtained by it through a settlement. Similarly, he will not be bound by any judgment or terms of settlement that flow from this action.

### B. *Cross-Motion to Dismiss Due Process Claims*

■ The defendants cross-move for dismissal of the due process claims under which the plaintiffs allege that their personal property was confiscated without compensation. The defendants argue that, under the rule enunciated in *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981), a prisoner's claim for deprivation of property does not state a claim in law unless it includes an allegation that the state provides neither pre-deprivation nor post-deprivation notice and hearing procedures that satisfy the due process requirements of the Fourteenth Amendment. The defendants point out that no such allegation is made here and that such an allegation could not be

made in good faith because New York law provides post-deprivation safeguards that are sufficient under *Parratt*.[10]

The problem with the defendants' argument is that it assumes that the ruling in *Parratt* can be stretched to fit the notably different situation presented in this case. That assumption is invalid. In *Parratt*, the prisoner complained of a negligent loss of his property, *id.* at 530, 101 S.Ct. at 1910; whereas in this case, intentional or grossly negligent acts are alleged.[11] In *Parratt*, the Court stressed that no constitutional amendment other than the Fourteenth Amendment was alleged to be violated, *id.* at 536, 101 S.Ct. at 1913; whereas here, the plaintiffs have alleged violations of their Fourth Amendment rights as well as of their Fourteenth Amendment rights. In addition, the prisoner in *Parratt* did not allege that the relevant state policies or procedures were themselves inadequate, *id.* at 543, 101 S.Ct. at 1917; whereas here, it is precisely such policies and procedures (with regard to selection, training, and supervision) that the plaintiffs are challenging.[12] Finally, the Court in *Parratt* relied greatly upon the sound point that the state could hardly be expected to hold a pre-deprivation hearing to determine the justness of an unauthorized and inadvertent taking of a prisoner's property by one state employee acting against state policies, *id.* at 541, 101 S.Ct. at 1916; whereas in this case, it is much more likely that pre-deprivation procedures might have economically

---

**10.** The particular provisions that the defendants appear to have in mind as extending adequate safeguards are the New York Court of Claims Act, *see supra* note 6, and New York Correction Law § 24(2) (McKinney 1968 & Supp.1983) (specifying the means by which one may seek redress for the torts of state prison officials). There is no need to consider the adequacy of these provisions, however, given this Court's resolution of the initial question of the applicability of *Parratt* to this case.

**11.** Several recent decisions suggest that the rule in *Parratt* may not be applicable in cases involving intentional torts or gross negligence. *See, e.g., Stringer v. Thompson*, 537 F.Supp. 133, 136–37 (N.D.Ill.1982); *Tarkowski v. Hoogasian*, 532 F.Supp. 791, 795 (N.D.Ill.1982); *Isaac v. Jones*, 529 F.Supp. 175, 180–81 (N.D.Ill.1981).

*But see, e.g., Sheppard v. Moore*, 514 F.Supp. 1372, 1376 (M.D.N.C.1981) (*Parratt* rule extended to apply to intentional torts).

**12.** Recent decisions sharply restrict, if not eliminate, the applicability of the *Parratt* doctrine to cases in which the challenged conduct is the direct result of official state policies or procedures. *See, e.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–36, 102 S.Ct. 1, 48, 1157–58, 71 L.Ed.2d 265 (1982) (*Parratt* distinguished where deprivation of property was caused by an "established state procedure"); *Toins v. Ignash*, 534 F.Supp. 452, 455–56 (E.D.Mich.1982) (*Parratt* not applicable where "policy of a state or municipal government" causes the deprivation). *But see Brown v. Brienen*, 553 F.Supp. 561, 566 (C.D.Ill.1982).

and readily prevented the CERT's alleged systematic and indiscriminate seizure of the inmates' non-contraband property, as well as the failure to segregate and identify it, which made its subsequent return practically impossible.

With these significant distinctions in mind, we conclude that the holding in *Parratt* should not be extended to apply to the situation presented in this case, particularly since the property losses are so closely linked with the personal injury claims. In other words, in a case such as this, the plaintiffs need not prove an absence of adequate post-deprivation state remedies in order to establish a claim under section 1983 and the Fourteenth Amendment. The defendants' motion to dismiss these claims is, therefore, denied.

### C. *Viability of the Claims Against Defendant Coughlin*

Defendant Thomas Coughlin, the Commissioner of the New York State Department of Correctional Services, contends that he did not personally participate in the selection, training, or supervision of the CERT and that he, therefore, cannot be held liable under section 1983. This argument, however, conveniently ignores the fact that Coughlin (who, as the Commissioner, has responsibility for his entire department) was present at the Jail throughout the period of time when the CERT was resecuring the facility, as well as the fact that he was the official who was initially contacted by the county with its request for assistance. Furthermore, the plaintiffs have alleged that he played a significant supervisory role throughout the relevant period.

Certainly, we agree with defendant Coughlin that he cannot be held liable simply under a theory of *respondeat superior. See, e.g., Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). However, he can be held liable under a theory of supervisory liability where the training and supervision of a number of employees, and not just the isolated acts of one or two of them, are the subject of the claim. *See, e.g., Owens v. Haas,* 601 F.2d 1242, 1246

(2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). In *Owens,* it was held that such liability arises when "the failure to supervise or the lack of a proper training program [is] so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of the plaintiff's constitutional rights." *Id. see also Wiltsie v. California Dep't of Corrections,* 406 F.2d 515, 516–17 (9th Cir. 1968) (held that Civil Rights Act claims were properly stated under theory of supervisory liability where director of state's department of corrections was allegedly responsible for formulating rules and regulations for facility at which plaintiff-prisoner was beaten by correction officers).

Because it is precisely such a failure to exercise supervisory responsibility that is alleged here, we find that the claims against Coughlin cannot be dismissed and that his motion must, therefore, be denied.

### D. *The Defendants' Cross-Motion for Abstention*

This last motion must be denied for the reasons outlined in the above discussion of the defendants' objections to certification of the class. *See supra* p. 1445. Neither considerations of comity nor any of the branches of the abstention doctrine require this Court to defer to the courts of New York in this matter, particularly where there is almost a complete absence of any ongoing state actions arising from the events in question.

### III. CONCLUSION

In accordance with the preceding discussion, the motion for certification of the requested class is granted and the defendants' cross-motions for dismissal of various claims and for abstention are denied.

SO ORDERED.